D

Westlaw.

800 A.2d 861                                                                                           Page 1
173 N.J. 59, 800 A.2d 861
(Cite as: 173 N.J. 59, 800 A.2d 861)

HK-Land Corp. No. 28 v. Landis Sewerage Authority
N.J.,2002.

Supreme Court of New Jersey.
K-LAND CORPORATION NO. 28,
Plaintiff-Appellant,
v.
LANDIS SEWERAGE AUTHORITY,
Defendant-Respondent,
andBerryman's Branch, Ltd., Defendant.
Argued April 29, 2002.
Decided July 16, 2002.

Property owner brought action against municipal sewerage authority, seeking reimbursement of approximately $400,000 that it expended to construct the force main portion of a sewer system. The trial court dismissed pursuant to the entire controversy doctrine. Property owner appealed. The Superior Court, Appellate Division, affirmed. After granting property owner's petition for certification, the Supreme Court, Stein, J., held that entire controversy doctrine did not apply to bar property owner's suit.

Reversed and remanded.

West Headnotes

[1] Action 13 €—53(1)

13 Action
    13III Joinder, Splitting, Consolidation, and Severance
        13k53 Splitting Causes of Action
            13k53(1) k. In General. Most Cited Cases
Polestar for the application of the "entire controversy rule," which is a claim-joinder requirement, is judicial fairness.

[2] Judgment 228 €—592

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
            228k591 Splitting Cause of Action

228k592 k. Single and Entire Causes of Action. Most Cited Cases
"Entire controversy doctrine" did not apply to bar property owner's suit against municipal sewerage authority that sought reimbursement of approximately $400,000 that property owner expended to construct the force main portion of a sewer system; property owner did not file a cross-claim in prior declaratory judgment action involving the parties and an owner of an adjacent mobile home park, but such a claim was premature at that time, since the property owner and authority reached substantial agreement on property owner's right of reimbursement and the only open issue was how property owner would be reimbursed if there was a deficiency remaining after other property owners paid their proportionate shares.

**861*60 Ronald S. Blumstein, Highland Park, argued the cause for appellant.
David C. Patterson, Berlin, argued the cause for respondent (Maressa, Goldstein, Birsner, Patterson, Drinkwater & Oddo, attorneys).

The opinion of the Court was delivered by
STEIN, J.
This appeal involves the entire controversy doctrine. K-Land Corporation No. 28 (K-Land) instituted this litigation to obtain reimbursement from the Landis Sewerage Authority (LSA or Authority) of approximately $400,000 that it expended to construct the 15,000-foot force main portion of a sewer system to be operated by LSA for the benefit of K-Land and other property owners in the immediate vicinity of K-Land's property. K-Land's claim against LSA was dismissed by the lower courts because of K-Land's failure to assert that claim in an earlier declaratory judgment suit instituted by the City of Vineland (Vineland) to *61 determine that it had title to the force main, a contention to which K-Land was willing to accede. When the Vineland suit was instituted, K-Land and LSA tentatively had agreed that LSA would assess and collect from adjacent**862 property owners their proportionate share of the cost of the force main and remit the proceeds to K-Land, but had not agreed on how K-Land would be reimbursed for any remaining deficiency. Because the owners of K-Land had filed for bankruptcy and because K-Land was largely indifferent to Vineland's attempt to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

800 A.2d 861  
173 N.J. 59, 800 A.2d 861  
**(Cite as: 173 N.J. 59, 800 A.2d 861)**

Page 2

resolve title to the force main, K-Land defaulted in the declaratory judgment proceeding. Subsequently, the remaining parties, including LSA and Berryman's Branch, Ltd. (Berryman's), owner of an adjacent mobile home park and one of the largest property owners to be served by the sewer system, entered into a consent judgment. One term of that judgment was that Berryman's would pay to LSA its proportionate share of LSA's cost to construct the sewer system's pumping station, the clear implication being that Berryman's would not be required to contribute to the force main.

Although the Appellate Division's unreported opinion recognized that a cross-claim by K-Land against LSA in the declaratory judgment suit would have been "premature" until the consent judgment was entered (at which time K-Land already had defaulted), the court sustained the Law Division's dismissal of K-Land's claims against LSA under the entire controversy doctrine. We granted certification, 171 N.J. 338, 793 A.2d 717 (2002), and now reverse.

I

Because they materially influence our decision, we set forth the relevant facts in some detail.

K-Land was formed for the purpose of acquiring approximately eighty acres of land in Vineland, New Jersey that had been approved for development of a three hundred seventy-nine unit mobile home park (Project). Although K-Land did not hold title to the Project site until July 1989, it controlled the property under ***62** an option to purchase. The Project's completion was conditioned on K-Land's construction of an off-site sewer line (force main) and a pumping station to connect the Project to existing facilities of the LSA, a municipal sewerage authority existing under N.J.S.A. 40:14A-1 to -45. The force main required for the connection was to be a six-inch pipe, extending approximately 15,000 linear feet. The New Jersey Department of Environmental Protection (NJDEP) had issued a permit for the construction of the force main in June 1984. However, the prior owner of the Project previously had obtained an extension of the permit for the construction and no further extensions were available to K-Land. Consequently, K-Land commenced installation of the force main by June 1989 to avoid expiration of the permit.

In late 1988, K-Land had begun discussions with LSA regarding sewer services to the Project. At that time, LSA realized that there was a need to service existing and future property owners. Accordingly, LSA requested that K-Land increase the size of the force main from six to eight inches and increase the size of the pumping station in order to accommodate additional service to those potential users. K-Land agreed to do so, but asked that LSA apply a "fair share" policy allowing for contribution by other users according to their fair share of the cost of the force main and the pumping station. K-Land further requested that LSA provide a credit against connection fees for costs incurred by K-Land in constructing the force main to the extent those costs were not offset by the contributions from other users. While discussions continued with LSA concerning those issues, K-Land installed the eight-inch force main before expiration of its permit. The cost of installing**\*\*863** the eight inch force main was approximately $400,000.

In October 1989, when the force main already had been installed, the City of Vineland (City) inquired of K-Land whether the force main would be dedicated to LSA. K-Land responded to the City's inquiry in a letter indicating that the force main "eventually [would] be owned by" LSA. The letter also stated that "[o]f ***63** course, the cost of such installation or the allocation of such costs is a completely different issue than who owns the lines and appurtenances once installed."

While discussions still were ongoing with LSA concerning applying a "fair share" policy and credits toward the cost of the force main, K-Land was engaged in discussions with other potential users of the proposed sewer facility. The primary potential user was Berryman's, a mobile park operator that was seeking to convert from a septic system to sewer service and also required the sewer service because of planned construction of additional mobile home pads within the park.

In a September 1990 letter to K-Land, LSA agreed with K-Land to a basic "fair share" policy, allowing for the certification of the costs for the force main and pumping station and requiring that future users pay their "fair share" of the costs to LSA, which in turn would disburse the payments to K-Land. However, LSA did not agree to provide K-Land with credits

against connection for the unreimbursed costs. LSA also indicated that "[f]ailure to pay the connection fees," which were scheduled by LSA to be paid annually, would result in the rescission of the developer's ability to use the minimum gallons per day (gpd) of the sewer facility's capacity that was allocated to that particular developer. According to LSA's connection fees payment schedule set forth in its letter to K-Land, Berryman's was required to pay its connection fees prior to connecting to LSA's sewer system.

Despite LSA's decision not to allow credits against connection fees, Berryman's was willing to proceed in order to obtain its sewer service. In a letter dated October 1, 1990, Berryman's proposed that Berryman's and another potential user, Lizzio, assume responsibility for obtaining a permit and constructing the regional pumping station. The letter also indicated that if K-Land's cost of constructing the force main exceeded its *pro rata* share of the cost of constructing the pumping station, K-Land would be compensated by the reimbursement from other users until such time as the unreimbursed costs for the construction of *64 the force main correlated to K-Land's, Berryman's, and Lizzio's *pro rata* shares. That Agreement was memorialized in writing, signed by Berryman's and delivered to LSA. However, according to K-Land's brief, the Agreement between Berryman's and K-Land never was implemented because LSA would not allow Berryman's to extend payment of its connection fees over time for its existing mobile home pads.

While that matter remained unresolved, the owners of K-Land, Michael and Morris Kaplan, filed for bankruptcy on February 1, 1991. As a result of their financial difficulties, neither construction of the pumping station nor development of K-Land's Project proceeded as scheduled.

In July 1991, Vineland filed a complaint against K-Land, Berryman's, LSA and the County of Cumberland (County). Apparently, the force main had been installed partially on rights-of-way owned by Vineland and the County. The complaint sought only a declaratory judgment concerning the ownership of the eight-inch force main previously constructed by K-Land. The complaint alleged that "[t]he line had been constructed but ha[d] not **864 been joined to the [Authority's] sewer line" and remained unused. In other relevant parts, the complaint states:

15. ... [K-Land] has decided not to proceed with the construction of the proposed development, and has declined to take any further action for the connection of the sewer line aforementioned

16. Berryman's ... has petitioned of Vineland and defendant, [LSA] to obtain ownership of said line in order for Berryman's Branch to construct a pumping facility [that] would permit its existent trailer park, and proposed increase of said park to be serviced by the [Authority] through the line aforementioned

17. At the current time, the ownership of said line [is] disputed with claims being made by the City of Vineland, [K-Land, LSA] and County of Cumberland

18. It is respectfully submitted to the court that ownership of the line should be established by way of an action for Declaratory Judgment, requesting the Court to define the ownership of said line.

The City sought a declaratory judgment "[e]stablishing ownership of the existing sewer line with the City of Vineland," or in the alternative with LSA.

*65 While bankruptcy proceedings were still ongoing, the Kaplans retained attorney Scott F. Jamison (Jamison), who previously had been an in-house attorney for the Kaplans but now had a private practice. Jamison still was handling non-bankruptcy litigation for the Kaplans. In order to evaluate the suit, Jamison requested and received an extension of time within which to file an answer to Vineland's complaint. Jamison appeared on behalf of the Kaplans at a scheduled conference regarding the declaratory judgment litigation. There now is some dispute concerning what was said at that conference.

According to the certification of Joseph P. Testa, who was then counsel for LSA,

counsel for K-Land indicated that he was aware that he had not filed any responsive pleadings as of that date, and indicated to the Court and all other counsel that he would be doing so immediately which would include various counts against [the City, LSA] and Berryman's Branch, Ltd. He further represented that he would present issues dealing with his client's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

800 A.2d 861 Page 4
173 N.J. 59, 800 A.2d 861
**(Cite as: 173 N.J. 59, 800 A.2d 861)**

Agreement and arrangement with Berryman's Branch, Ltd on construction of the sewer line and pump station to service his client's proposed mobile home project. He further represent[ed] that he would present issue[s] concerning [LSA] in regard to the assessment and manner of calculating the connection fee to be charged to his client by the Authority, the manner of allocating sewer capacity to his client, reimbursements and credit due to his client for construction of the sewer line to service his client's proposed mobile home park and the ownership of the sewer line.

The certification of James J. Gruccio, counsel for Berryman's, states:
During the conference ... Mr. Jamison indicated that, while he had not yet done so, he fully expected to file a responsive pleading on behalf of K-Land ... [and] that K-Land had various affirmative claims against Berryman's as well as [LSA].... Mr. Jamison explained that the claims against Berryman's involved an alleged agreement entered into between Berryman's and K-Land regarding the construction of the force main. Mr. Jamison indicated that the claims against [LSA] involved the connection fees charged and the alleged reimbursement**865 agreements related to the force main. Mr. Jamison indicated ... that these allegations would form the basis of the cross claims to be asserted by K-Land when it filed its answer.

The certification of Ronald S. Blumstein, who was then the only remaining in-house attorney for the Kaplans after they filed for bankruptcy, asserts:
*66 Mr. Jamison was asked to look into the litigation initiated by the City of Vineland to determine whether we needed to expend any of our limited and already overly stretched resources in this litigation, in order to preserve K-Land's rights .... My recollection is that Mr. Jamison reported back to me that he had attended an initial conference in the case. He reported that he had advised the other parties to the action that K-Land's position had always been that the force main would ultimately be dedicated to either the City or the Authority upon completion and acceptance.... Mr. Jamison indicated that there was some discussion regarding K-Land's position with respect to the "fair share" concept and credits against connection fees, but everyone also acknowledged that those issues were separate and apart from the ownership issue. Following this discussion, Mr. Jamison and I concluded that K-Land did not have to continue in this litigation, inasmuch as K-land did not have an interest in the Court's determination as to whether the force main would ultimately be owned by the City, the Authority or the County.

Jamison's own certification provides:
I was advised by counsel for the respective parties ... that the dispute presented in the action was solely related to the ownership of the sewer line.... It is my recollection that the attorneys for the City and the Sewerage Authority indicated that they did not have an objection to K-Land Corp. [ ] being compensated in accordance with the applicable statutes and that the issue of reimbursement was a separate issue, not in dispute. The only dispute involved ownership among the various municipal entities....

Following this conference, I discussed this matter with my client. It was concluded that K-Land [ ] had no objection to either the City or the Sewerage Authority becoming the owner of the subject line. As a result, no responsive pleadings were filed in that action by K-Land [ ]. K-Land [ ] did not dispute the right of ownership in either the City [or] the Sewerage Authority and had no objection to the relief sought, as it was solely limited to ownership.

There was a subsequent meeting among counsel that Jamison did not attend. Following that meeting, the attorney for Vineland informed Jamison by letter that a default judgment would be entered against K-Land if a responsive pleading was not filed. When an answer still was not forthcoming, Vineland entered a default judgment in January 1992. Subsequently, the remaining parties discussed a settlement in the declaratory judgment litigation that resulted in a consent judgment filed on June 4, 1992. The consent judgment, which was signed by counsel for LSA, Berryman's, Vineland and the County, provides:

1. The sewer line ... shall be transferred to the Landis Sewerage Authority for maintenance and control.

....

*67 3. [T]he [Authority] will construct a pumping station that will be feasible for the entire area ....

4. Berryman's Branch will be responsible for their proportionate share of **866 the costs of the facilities plan and the construction of the pumping station based

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

800 A.2d 861  Page 5
173 N.J. 59, 800 A.2d 861
(Cite as: 173 N.J. 59, 800 A.2d 861)

upon the amount of gallonage used by Berryman's Branch through said pumping station.

5. Berryman's Branch agrees to pay their proportionate share of the costs of the facilities plan and construction of the pumping station based upon their proportionate share of gallonage payable twenty-five (25%) percent in advance and the remaining seventy-five (75%) percent of their proportionate share of costs over a four (4) year period with interest to run at one point above prime, said payments to be made annually in four equal installments. (For example, if the pumping stations costs $400,000.00 and it is determined that the amount of gallonage to be used by Berryman's Branch would be 1/4 of the total gallonage used by the pumping station, then Berryman's Branch would owe $100,000 with 25% down and 75% payable over four years with interest). [LAS] and Berryman's Branch further agree that in no event shall Berryman's Branch's proportionate share be any greater than One Hundred Thousand ($100,000.00) Dollars in the event the total cost of the pumping station should exceed the estimated Four Hundred Thousand ($400,000.00) Dollar figure.

6. Berryman's will hook up all of the existing units, ... plus all the new expansion units to [LAS] paying connection fees for the new units constructed as they are hooked up, but as to the existing [ ] units they will pay those connection fees financed over the next four years with interest at one point above prime, said payments to be made annually in four equal installments....

By its terms, the consent judgment appears inconsistent with the tentative status of the discussions between LSA and K-Land as reflected in LSA's September 1990 letter to K-Land. Pursuant to paragraph 11 of LSA's letter to K-Land, LSA would "have the right to collect" assessments from potential users of the sewer system and place "in escrow" for K-Land, "a pro rata share of the [force main] construction costs." However, under the consent judgment between LSA, Berryman's, Vineland and the County, Berryman's would be responsible only for its proportionate share of the cost of the construction of the pumping station. The consent agreement did not provide for payment of the "fair share" costs of the force main from Berryman's or any other potential user.

As indicated, K-Land took no part in negotiations leading to the consent judgment, having earlier been defaulted. However, after K-Land's attorney became aware that the terms of the consent *68 judgment were prejudicial to K-Land's right of reimbursement and that it went beyond the issue of ownership, he sought to negotiate directly with counsel for LSA and Berryman's, hoping to avoid further litigation. After those negotiations proved fruitless, K-Land instituted an action against LSA and Berryman's in September 1994, about twenty months after the default judgment against it in Vineland's suit. The first count of the complaint sought judgment against LSA compelling it to "either reimburse K-Land ... for the cost of constructing the force main or compelling it to impose and collect a special assessment from all future users of the regional sewer system and reimburse K-Land [ ] therefrom." Another count sought a judgment declaring "that [K-Land] is entitled to a credit against or waiver of connection fees from LSA equal **867 to its cost of installing the force main." Yet another count sought compensatory damages against Berryman's as a result of Berryman's breach of the alleged agreement with K-Land to construct the pumping station. A final count sought judgment declaring that the execution of the consent judgment in the earlier declaratory judgment action was invalid.

Before the trial court, K-Land contended that it had certain rights associated with its construction of the force main and merely sought to be treated in a manner "substantially equal" to the manner in which LSA treated all other users of its sewer system. K-Land maintained that those rights did not accrue until such time as LSA permitted other users to use the force main without contributing their "fair share." Accordingly, K-Land did not file a cross-claim against LSA in the declaratory judgment litigation because that litigation addressed only issues of ownership. K-Land asserted that any claim against LSA because LSA excused Berryman's from contributing to the cost of the force main did not accrue until the consent judgment was entered.

The trial court granted LSA's and Berryman's motions to dismiss based on the entire controversy doctrine. See R. 4:30A. The court concluded that the lawsuit was precluded because "K-Land should have been involved in the first litigation, wherein the *69 ownership of the line would be resolved and where

800 A.2d 861 Page 6
173 N.J. 59, 800 A.2d 861
**(Cite as: 173 N.J. 59, 800 A.2d 861)**

any credits or any permission to use that line would have been involved." It added that "[o]bviously, the ownership of that line implies the right to the use of that line. But if the ownership of the line was determined to belong to the sewerage authority, certainly the use of that line would be pursuant to whatever rules and regulations the [A]uthority had formulated." It declined to consider principles of equity, determining "that the law would [not] allow [it] to get into the equities and the unfairness of the remedy in a case under these particular facts."

The Appellate Division affirmed in an unreported opinion, finding that "[t]he 1991 litigation presented a full and complete opportunity for K-Land to litigate the issues now presented in the 1994 action." The court determined that K-Land's counsel "understood fully that the reimbursement issues could be raised by way of cross-claim in the declaratory judgment action, notwithstanding his assertion that he viewed them as a separate issue from the [issue of] ownership." Even though it acknowledged that the issues raised by K-Land would have been somewhat "premature," the court determined that those issues "still should have been raised and, if necessary, reserved for disposition at a later time." The court seemed to view K-Land's "assertion that its claims had not accrued" because of its ongoing discussions with LSA as contradicted by the fact that the present suit raises issues regarding reimbursement and contribution that were unresolved when the force main first was constructed. It concluded that "[a]lthough the complaint only sought a declaration as to ownership of the sewer line, it was not entirely unpredictable that other related issues would arise and might be discussed and resolved in the course of the litigation, as did occur through the consent judgment."

II

In September 1998, in response to recommendations of the Civil Practice Committee, this Court authorized rule amendments to \*70 eliminate mandatory party joinder under the entire controversy doctrine, and to abrogate preclusion of a successive action against a person not joined in the initial action except in cases involving inexcusable conduct and clear prejudice.\*\*868 Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 4:30A (2002). That restored the doctrine's original status as a claim-joinder requirement, the contours of which are described by Judge Pressler in her commentary to the Rule:

The entire controversy doctrine, an equitable preclusionary doctrine whose purposes are to encourage comprehensive and conclusive litigation determinations, to avoid fragmentation of litigation, and to promote party fairness and judicial economy and efficiency, was originally conceived of as a claim-joinder mandate, requiring all parties in an action to raise in that action all transactionally related claims each had against any other whether assertible by complaint, counterclaim, or cross-claim.... Although the court rules had not initially contained any provision expressly referring to the entire controversy doctrine, R. 4:27-1(b) was added to the rule governing joinder of claims effective September 1979 to provide for mandatory joinder of claims under the doctrine, which, however, was undefined, it having been then and remains still the Supreme Court's view that development of the substantive content of the doctrine is best left to case law.

....

The rule as to claim joinder continues to require, as a general matter, that all aspects of the controversy between those who are parties to the litigation be included in a single action.

....

*[T]he equitable nature of the doctrine[ ] bar[s] its application where to do so would be unfair in the totality of the circumstances and would not promote any of its objectives, namely, the promotion of conclusive determinations, party fairness, and judicial economy and efficiency.*

....

*Nor does the doctrine apply to bar component claims either unknown, unarisen or unaccrued at the time of the original action.*

[Pressler, *Current N.J. Rules,* comments 1 & 2 on *R.* 4:30A (2002) (emphasis added).]

In determining the appropriate scope of the entire controversy's claim joinder requirement, it is significant that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the leading cases establishing and applying the entire controversy doctrine as a bar to the subsequent assertion of omitted claims appear to have involved deliberate and calculated claim-splitting strategies designed to frustrate the orderly administration of justice, as opposed to an innocent omission by an uninformed litigant.

[_Prevratil v. Mohr,_ 145 _N.J._ 180, 203, 678 _A._2d 243 (1996) (Stein, J., dissenting).]

*71 See, e.g., _Massari v. Einsiedler,_ 6 _N.J._ 303, 312-13, 78 _A._2d 572 (1951) (holding that defendant in initial action brought to recover unpaid purchase price for sale of business was barred from filing second action for reformation of contract on which initial action was based); _Ajamian v. Schlanger,_ 14 _N.J._ 483, 488-89, 103 _A._2d 9, cert. denied, 348 _U.S._ 835, 75 _S.Ct._ 58, 99 _L.Ed._ 659 (1954)(barring second suit to recover damages for fraudulent representations brought by assignee of plaintiff that instituted initial suit for contract rescission based on same alleged misrepresentations); _William Blanchard Co. v. Beach Concrete Co., Inc.,_ 150 _N.J.Super._ 277, 293-94, 375 _A._2d 675, certif. denied, 75 _N.J._ 528, 384 _A._2d 507 (1977)(applying rationale of entire controversy doctrine in affirming trial court's ruling barring filing of amended complaint seeking to assert **869 claims that deliberately were withheld from pending action); _Falcone v. Middlesex County Medical Soc'y,_ 47 _N.J._ 92, 94-95, 219 _A._2d 505 (1966)(barring second action by doctor against Medical Society for damages following initial action resulting in judgment compelling doctor's admission in Medical Society).

A recent Appellate Division decision illuminates the equitable limitations on the mandatory claim joinder requirement. In _Hillsborough Township Bd. of Educ. v. Faridy Thorne Frayta, P.C.,_ 321 _N.J.Super._ 275, 728 _A._2d 857 (App.Div.1999), the issue was whether the Township's initial suit against contractors and professionals involved in the construction of a new elementary school to recover damages because of lead-containing solder in the drinking water barred later suits against those and other parties to recover damages for other defects known to the Township when the first suit was filed. In 1990, when the school was completed, the Township learned of the lead-containing solder in the drinking water as well as two other defects: improper installation of ceiling fans and water infiltration through the roof and windows. In November 1992, while the Township negotiated directly with the contractors and their sureties about the ceiling fans and water leaks, it sued the plumbing contractor (DiNatale) and its surety, as well as the architect, Faridy Thorne Frayta (Faridy), and the *72 construction manager, Wagner-Hohns-Inglis (Wagner), for failure to supervise the plumber. The Township was represented successively by two lawyers, Griggs and Broscious, in that litigation, which eventually was dismissed against the surety on statute of limitations grounds and all other parties by stipulation in May 1994. No damages were recovered by the Township.

Negotiations concerning the ceiling fans having been unsuccessful, the Township in August 1995 sued DiNatale, Faridy, Wagner and Middle State, the consulting engineer, alleging negligence in design, installation and specification of ceiling fans. The trial court dismissed the claims against Faridy and Wahner on entire controversy grounds. In January 1996, after an independent expert reported that the water leakage through the roof and windows may have resulted from design defects, the Township amended its complaint to seek damages for roof design defects against Faridy, Wagner and Middle State, as well as Biehn, the general contractor, and Donnelly, the roofing contractor. The amended complaint also alleged malpractice against Griggs and Broscious, the former lawyers, for failing to join all claims in the initial suit. Initially, the trial court dismissed the claims against all defendants, except the lawyers, under the entire controversy doctrine, but on reconsideration the claims against all defendant other than Faridy and Wagner were reinstated.

The Appellate Division granted leave to appeal sought by Broscious, one of the malpractice defendants, who asserted that the Township had been unaware when it filed the first action that the ceiling fan and water leakage problems were attributable to design defects. The Appellate Division acknowledged that "[t]he entire controversy doctrine does not apply to bar component claims that are either unknown, unarisen or unaccrued at the time of the original action." _Id._ at 283, 728 _A._2d 857 (citation omitted). The court also referred to this Court's acknowledgment of the doctrine's equitable origins:

Although the explicit wording of the rule governing

800 A.2d 861
173 N.J. 59, 800 A.2d 861
(Cite as: 173 N.J. 59, 800 A.2d 861)

Page 8

the mandatory joinder of claims has remained unchanged, the Court continues to emphasize that equitable considerations should ease the path upon which the doctrinal bar travels. See, e.g., *73 Joel v. Morrocco, 147 N.J. 546, 555, 688 A.2d 1036 (1997)**870 (recognizing that "equitable considerations can relax mandatory-joinder requirements when joinder would be unfair"). Preclusion should be a remedy of last resort. Olds[ v. Donnelly], supra, 150 N.J.[424] at 446-47, 696 A.2d 633 [1997]. As the Court recently noted: "[t]he twin pillars of the entire controversy doctrine are fairness to the parties and fairness to the system of judicial administration." Gelber[ v. Zito Partnership], supra, 147 N.J.[561] at 565, 688 A.2d 1044 [1997] (citing Joel v. Morrocco, 147 N.J. 546, 555, 688 A.2d 1036 (1997)). In considering fairness to the party whose claim is sought to be barred, a court must consider whether the claimant "had a fair and reasonable opportunity to have fully litigated that claim in the original action." Ibid.

[Id. at 284, 728 A.2d 857 (footnote omitted).]

The Appellate Division reversed the trial court and reinstated the complaint against Faridy and Wagner, concluding that neither the interests of judicial economy nor prejudice to the defendants justified dismissal. The court observed:

Here, the only issue presented in the lead-solder litigation involved Hillsborough's claim for damages associated with the plumber's use of lead solder in the drinking water when the plans, specifications and applicable codes prescribed use of non-lead solder. Allegations of design defects were not implicated in that complaint at all. The only allegation against Faridy and Wagner was their alleged negligence in failing to supervise the plumbers during their installation of piping while using lead solder. Thus, the claims are clearly separate and discrete. There would be no replication of proofs. The trial court would not be retracing ground that had already been covered. Judicial economy will not, therefore, be sacrificed. The fact that the various claims may have arisen out of the same construction job should not be the determinative factor.

The policies underlying application of the entire controversy doctrine would not be promoted by barring the claims under the circumstances presented here. The claims against Faridy, the architect, and Wagner, the construction manager, were never adjudicated on the merits. Hillsborough dismissed its claim for negligent supervision of the plumber against Faridy and Wagner. That disposition resulted in a voluntary stipulation of dismissal with prejudice between Hillsborough and defendants. However, neither Faridy nor Wagner provided payment or any other form of consideration for the dismissal. Hillsborough did not exchange any form of release running in favor of either Faridy or Wagner. Defendants could receive a "windfall" by being permitted to escape any potential liability for any design defects because Hillsborough dismissed the claim against them for negligent supervision. The entire controversy doctrine should not be deployed under the circumstances here to bar Hillsborough's claims, which were never adjudicated on the merits.

In addition, the unfairness to Hillsborough and to Broscious in not being permitted to assert its meritorious claims and cross-claims against Faridy and Wagner far outweighs any prejudice to the parties asserting the preclusion.

*74 Any "unfairness" to Faridy in permitting the claims is questionable. Faridy was the architect in charge of designing the school, and the school was constructed in accordance with those designs. There is no evidence that any modifications to the roof have occurred between 1990 and present. The record does not indicate that "global settlement"**871 negotiations have commenced. Moreover, Hillsborough, even in the absence of any earlier filing, could have waited six years before initiating an action against Faridy and Wagner and still have been within the statute of limitations period. Thus, there can be no legal prejudice to Faridy for not examining the roof because Hillsborough could have legally waited up to six years to commence its lawsuit.

[Id. at 286-87, 728 A.2d 857.]

III

[1] We emphasize again that "the polestar for the application of the [entire controversy] rule is judicial 'fairness.' " Reno Auto Sales, Inc. v. Prospect Park Sav. & Loan Ass'n, 243 N.J.Super. 624, 630, 581 A.2d 109 (App.Div.1990) (citing Cogdell v. Hosp. Ctr. Of Orange, 116 N.J. 7, 28, 560 A.2d 1169 (1989)).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

800 A.2d 861  
173 N.J. 59, 800 A.2d 861  
**(Cite as: 173 N.J. 59, 800 A.2d 861)**

Page 9

[2] In our view, the Appellate Division did not focus sufficiently on considerations of fairness when it observed that "[t]he 1991 action was the perfect opportunity for K-Land to resolve the issues that had been festering for several years," further noting that "plaintiff's counsel understood fully that the reimbursement issues could be raised by way of cross-claim in the declaratory judgment action."

Our interest in mandatory claim joinder should not be viewed as encouraging or requiring the filing of premature or unaccrued claims. As the record demonstrates, at the time the declaratory judgment action was filed K-Land and LSA had reached substantial agreement on K-Land's right to reimbursement of the cost of the force main. LSA had agreed to assess the other property owners their fair share of the force main's costs and remit the proceeds to K-Land. The only unresolved issue was how K-Land would have been reimbursed if there was a deficiency remaining after the other property owners had paid their proportionate shares. To require K-Land to file a cross-claim in the declaratory judgment action to resolve that open issue, when the record is **\*75** silent on whether negotiations were likely to result in resolution of the issue, transforms the entire controversy doctrine from one designed to conserve judicial resources to a doctrine designed to encourage litigation. This record simply does not support the conclusion that when the declaratory judgment suit was filed negotiations between K-Land and LSA were so adverse that litigation was K-Land's only recourse. To the contrary, the only unresolved issue appeared to be whether K-Land could apply its future connection fees as a credit against any deficiency it realized because assessments against other property owners did not fully reimburse it for the force main.

Other equitable factors counsel against dismissal of the second suit. The declaratory judgment suit sought only to clear title to the force main, and K-Land previously had expressed its willingness to transfer title to LSA. LSA's action did not assert any damage claims against any party. K-Land's principals had filed for bankruptcy, and K-Land understandably would be reluctant to incur legal costs that from its perspective were then unnecessary. Moreover, the consent judgment that revealed for the first time that LSA did not intend to assess Berryman's for the force main was not entered until after K-Land had defaulted.

Finally, no prejudice alleged by either LSA or Berryman's justifies preclusion of K-Land's suit. As the record demonstrates, K-Land has expended approximately $400,000 for a force main that will benefit Berryman's, other users, and LSA, and has received no reimbursement. K-**\*\*872** Land's claim for reimbursement should be no more difficult or inconvenient to defend against than if it had been asserted in the declaratory judgment action.

IV

For the reasons stated, we reverse the judgment of the Appellate Division and remand the matter to the Law Division for further proceedings consistent with this opinion.

**\*76** *For reversal and remandment*-Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI-7.  
*Opposed*-None.  
N.J.,2002.  
K-Land Corp. No. 28 v. Landis Sewerage Authority  
173 N.J. 59, 800 A.2d 861

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.