Westlaw.

696 A.2d 633
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

Page 1

▷Supreme Court of New Jersey.
Robert OLDS, Plaintiff-Respondent,
v.
Dennis DONNELLY, Defendant and Third Party
Plaintiff-Appellant,
v.
Joe MARAN, Third Party Defendant-Respondent.

Argued Feb. 3, 1997.
Decided July 16, 1997.

Client brought legal malpractice claim against
attorney who first represented him in medical
malpractice action that was dismissed with prejudice
for failure to timely serve summons and
complaint. Defendant filed third-party complaint
against successor attorney in medical malpractice
action. Defendant and third-party defendant filed
motions to dismiss. The Superior Court, Law
Division, Essex County, denied defendant's motion to
dismiss and granted third-party defendant's motion to
dismiss third-party complaint. Defendant
appealed. The Superior Court, Appellate Division,
291 N.J.Super. 222, 677 A.2d 238, affirmed as to those
portions of judgment. Granting certification, the
Supreme Court, Pollock, J., held that: (1) entire
controversy doctrine does not compel the assertion of
a legal malpractice claim in underlying action that
gives rise to the claim; abrogating *Circle Chevrolet
Co. v. Giordano, Halleran & Ciesla, 142 N.J. 280,
662 A.2d 509;* (2) legal malpractice action did not
accrue in present case until dismissal of underlying
action for failure to timely serve summons and
complaint, and thus entire controversy doctrine did not
obligate client to join attorney in underlying action;
(3) successor attorney did not owe defendant a duty of
care, and thus could not be held liable on defendant's
third-party negligence complaint.

Judgment of Appellate Division affirmed.

Stein, J., filed an opinion concurring in part and
dissenting in part.

West Headnotes

[1] Action 53(1)

13k53(1)Most Cited Cases
Entire controversy doctrine seeks to assure that all
aspects of a legal dispute occur in a single lawsuit;
goals of doctrine are to promote judicial efficiency,
assure fairness to all parties with a material interest in
an action, and encourage conclusive determination of
a legal controversy. R. 4:30A.

[2] Action 53(1)
13k53(1)Most Cited Cases
Entire controversy doctrine encompasses virtually all
causes, claims, and defenses relating to a controversy
between parties engaged in litigation. R. 4:30A.

[3] Limitation of Actions 95(1)
241k95(1)Most Cited Cases
Discovery rule involves two elements: actual injury
and knowledge of fault.

[4] Limitation of Actions 55(3)
241k55(3)Most Cited Cases

[4] Limitation of Actions 95(11)
241k95(11)Most Cited Cases
Mere knowledge of an attorney's negligence does not
cause legal malpractice claim to accrue; as an action
grounded in tort, legal malpractice action accrues
when attorney's breach of professional duty
proximately causes plaintiff's damages.

[5] Limitation of Actions 55(3)
241k55(3)Most Cited Cases
"Actual damage," such as must be sustained by client
before legal malpractice action may accrue, is real, not
speculative.

[6] Limitation of Actions 55(3)
241k55(3)Most Cited Cases
Adverse judgment may constitute damage signifying
accrual of legal malpractice action.

[7] Pretrial Procedure 560
307Ak560Most Cited Cases
Generally, violation of rule requiring issuance of
summons within ten days of filing of complaint will
not result in dismissal of action when defendant is not
prejudiced, complaint appears meritorious, and failure

E 1

696 A.2d 633

150 N.J. 424, 696 A.2d 633

**(Cite as: 150 N.J. 424, 696 A.2d 633)**

Page 2

to make proper service is attributable solely to neglect of plaintiff's attorney; dismissal is reserved for those situations where no lesser sanction will erase prejudice suffered by nondelinquent party. R. 4:4-1.

[8] **Action** ☜53(2)

13k53(2)Most Cited Cases

Legal malpractice action did not accrue until date of dismissal with prejudice of underlying medical malpractice action for failure to timely serve summons and complaint, even though client was aware of attorney's negligence prior to that date and trial court could have dismissed complaint earlier for untimely service; thus, client had no obligation under entire controversy doctrine to join attorney in underlying medical malpractice action. R. 4:4-1; R. 4:30A.

[9] **Action** ☜53(2)

13k53(2)Most Cited Cases

Entire controversy doctrine does not compel the assertion of a legal malpractice claim in an underlying action that gives rise to the claim; abrogating *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 142 *N.J.* 280, 662 *A.*2d 509. R. 4:30A.

[10] **Attorney and Client** ☜26

45k26Most Cited Cases

Successor attorney representing plaintiff in medical malpractice action did not owe predecessor a duty of care, and thus could not be held liable on predecessor's third-party complaint for negligence, brought after client sued predecessor for malpractice based on failure to timely serve complaint and summons.

[11] **Judgment** ☜592

228k592Most Cited Cases

Preclusion of a second action under entire controversy doctrine is a remedy of last resort; if remedy other than preclusion will vindicate cost or prejudice to other parties and judicial system, court should employ such a remedy. R. 4:30A.

[12] **Judgment** ☜592

228k592Most Cited Cases

Before precluding second action under entire controversy doctrine, court must determine whether plaintiff in earlier action was required to notify court of the party alleging preclusion. R. 4:30A.

[13] **Courts** ☜100(1)

106k100(1)Most Cited Cases

Decision holding that entire controversy doctrine does not compel the assertion of a legal malpractice claim in underlying action that gives rise to the claim would have limited retroactivity, applying to all pending cases, whether on appeal or in trial courts. R. 4:30A.

[14] **Courts** ☜100(1)

106k100(1)Most Cited Cases

Ordinarily, judicial decisions apply retroactively.

[15] **Courts** ☜100(1)

106k100(1)Most Cited Cases

Policy considerations which may justify giving a decision only limited retroactive effect are whether litigants reasonably have relied on settled law in ordering their affairs, whether retroactive application will advance the purposes of rule announced in decision, and whether retroactive application would produce inequitable results and adversely affect administration of justice.

**\*\*635**Christopher J. Carey, Newark, argued the cause for appellant (Tompkins, McGuire & Wachenfeld, attorneys; John P. O'Toole, on the brief).

Joseph Maran, Jr., Newark, argued the cause for respondent Robert Olds (Maran & Maran, attorneys).

William W. Voorhees, Jr., Morris Plains, argued the cause for respondent Joe Maran (Voorhees & Acciavatti, attorneys).

Andrew P. Napolitano, Newark, argued the cause for amicus curiae, New Jersey State Bar Association (Cynthia M. Jacob, President, Somerset, attorney; Linda Lashbrook, Woodbridge, on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The basic issue in this case, as in *Karpovich v. Barbarula,* 150 *N.J.* 473, 696 *A.*2d 659 (1997) and *Donohue v. Kuhn,* 150 *N.J.* 484, 696 *A.*2d 664 (1997), also decided today, is the application of the entire controversy doctrine to legal-malpractice actions.

**\*428** Plaintiff, Robert Olds, retained defendant, Dennis     Donnelly,     Esq.,     to     pursue     a

medical-malpractice action against Dr. Floyd J. Donahue. Ultimately, Donnelly withdrew as counsel. Olds claims that before Donnelly withdrew, he failed to serve the summons and complaint on Dr. Donahue. The Law Division in the medical-malpractice action dismissed the complaint with prejudice for untimely service.

Olds then filed this attorney-malpractice action against Donnelly. Donnelly moved to dismiss, arguing that Olds should have joined him in the medical-malpractice action. The Law Division denied Donnelly's motion, holding that Olds's legal-malpractice claim did not accrue until dismissal of the medical-malpractice claim. The Appellate Division affirmed. 291 N.J.Super. 222, 677 A.2d 238 (1996).

We granted certification, 146 N.J. 565, 683 A.2d 1161 (1996), and now affirm and modify the judgment of the Appellate Division. We affirm the Appellate Division's holding that the entire controversy doctrine does not bar this action, which had not accrued during the pendency of the underlying medical-malpractice **636 action. We further hold that the party-joinder requirements of the entire controversy doctrine do not extend to claims of attorney malpractice. We do not decide whether to relax the requirements of party joinder in cases involving others with a fiduciary relationship to the parties.

I.

The facts are undisputed. On June 27, 1985, Dr. Donahue allegedly committed medical malpractice while operating on Olds. Approximately one month later, Olds retained Donnelly to represent him in a possible medical-malpractice action against Dr. Donahue. The Retainer Agreement indicated that Donnelly accepted the retainer subject to investigation.

On June 25, 1987, two days before the expiration of the statute of limitations on the medical-malpractice claim, Olds and Donnelly met at Donnelly's office. Donnelly advised Olds that he no longer *429 wished to represent him, but that he would prepare a pro se complaint and serve it on Dr. Donahue. Olds agreed, and Donnelly filed the complaint the same day.

Donnelly attempted service on Dr. Donahue by mail. He used the wrong address, however, and the

summons and complaint were returned to Donnelly's office. On August 10, 1987, Donnelly mailed the summons and complaint to Dr. Donahue at a different address. The papers were sent certified mail, with the return receipt addressed to Olds. Olds never received the receipt.

Sometime in 1988, Olds received a notice from the Clerk of the Union County Superior Court informing him that the case would be dismissed for lack of prosecution. Olds called Donnelly to tell him that Dr. Donahue had not been served. According to Olds, Donnelly said that "he would take care of it." In July of 1988, Donnelly sent Olds a letter indicating that the attempts to serve Dr. Donahue by mail were unsuccessful and that Donnelly had closed his files on the matter. In this letter, Donnelly also informed Olds that it was "up to [Olds] to pursue this."

In 1989, Olds received another notice indicating that the case would be dismissed for lack of prosecution. A court clerk assisted Olds in preparing a summons. The Union County Sheriff served the summons and complaint on Dr. Donahue in July 1989. Olds continued to prosecute the action pro se.

In February 1991, Dr. Donahue filed a motion under Rule 4:4-1 to dismiss the complaint for Olds's failure to make timely service. On February 19, 1991, shortly after the filing of the motion, third-party defendant, Joe Maran, Esq., filed a Substitution of Attorney for Olds.

The Law Division heard oral argument on Dr. Donahue's motion to dismiss on March 22, 1991. Maran opposed the motion for Olds. The court determined that the two-year delay in serving Dr. Donahue had prejudiced him because of the loss or destruction of medical records. Accordingly, the court granted the doctor's motion to dismiss the complaint with prejudice.

*430 Thirteen months later, in April 1992, Olds, represented by Maran, instituted this legal-malpractice action against Donnelly. Olds alleged that Donnelly had failed to effect timely service of the complaint in the underlying medical-malpractice action, thus causing the dismissal of the suit with prejudice.

With his answer to the complaint, Donnelly filed a third-party complaint against Maran. Donnelly

E 3

696 A.2d 633
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

Page 4

alleged that Maran had failed properly to oppose the motion to dismiss and also had failed to notify Donnelly, thereby depriving him of the opportunity to oppose the motion himself. According to the third-party complaint, Maran's negligence caused the dismissal of Donnelly's pro se complaint against Dr. Donahue.

On February 5, 1993, the Law Division granted Maran's motion to dismiss the third-party complaint. The court noted that because "Maran was not on the scene in July of 1989," Olds's legal-malpractice claim was against Donnelly alone. Thus, the court concluded that Maran had not violated any duty to Donnelly.

On April 2, 1993, the trial court denied Donnelly's motion to reconsider the dismissal of the third-party complaint. On March 18, 1994, about one month before the scheduled **637 trial date, Donnelly moved for summary judgment. He argued that under the entire controversy doctrine Olds should have asserted his legal-malpractice claim against Donnelly in the medical-malpractice action against Dr. Donahue. The trial court denied Donnelly's motion.

Olds's legal-malpractice action against Donnelly proceeded to trial in December of 1994. The jury returned a verdict of $500,000 for Olds. The trial court, however, granted Donnelly's motion for judgment notwithstanding the verdict. The court held that the evidence did not support a finding of legal malpractice that proximately caused the dismissal of the action against Dr. Donahue.

Olds appealed. Donnelly cross-appealed challenging the orders denying summary judgment on entire controversy grounds and *431 dismissing the third-party complaint. The Appellate Division reversed and remanded for entry of a judgment in Olds's favor. *291 N.J.Super.* at 234, 677 A.2d 238.

The Appellate Division also denied Donnelly's cross-appeals. It held that ***Circle Chevrolet Co. v. Giordano, Halleran & Ciesla, 142 N.J. 280, 662 A.2d 509 (1995)***, did not require Olds to have joined Donnelly in the medical-malpractice action against Dr. Donahue. *291 N.J.Super.* at 232, 677 A.2d 238. The court reasoned that Olds's legal-malpractice claim against Donnelly did not accrue until the dismissal of Olds's medical-malpractice action against

Dr. Donahue. *Ibid.* Because the entire controversy doctrine does not bar claims that are unknown, unarisen, or unaccrued at the time of the original action, the doctrine did not prevent Olds from pursuing his legal-malpractice claim against Donnelly. *Ibid.*

The Appellate Division further found that the trial court correctly dismissed Donnelly's third-party complaint against Maran. *Id.* at 233, 677 A.2d 238. It held that Maran "owed no duty to [Donnelly]" and that "[a]bsent that duty, no cause of action could exist." *Ibid.* (citing *Malewich v. Zacharias,* 196 N.J.Super. 372, 482 A.2d 951 (App.Div.1984)).

## II.

[1] Basically, the entire controversy doctrine seeks to assure that all aspects of a legal dispute occur in a single lawsuit. The goals of the doctrine are to promote judicial efficiency, assure fairness to all parties with a material interest in an action, and encourage the conclusive determination of a legal controversy. *DiTrolio v. Antiles,* 142 N.J. 253, 267, 662 A.2d 494 (1995); *Prevratil v. Mohr,* 145 N.J. 180, 187, 678 A.2d 243 (1996). One part of the doctrine, described generally as "claims joinder," requires that parties should present all affirmative claims and defenses arising out of a controversy. R. 4:30A; *Wm. Blanchard Co. v. Beach Concrete Co., Inc.,* 150 N.J.Super. 277, 292-94, 375 A.2d 675,certif. denied,75 N.J. 528, 384 A.2d 507 (1977). Another *432 part, known as "party joinder," requires the mandatory joinder of all parties with a material interest in a controversy. R. 4:30A.

The origins of the doctrine precede the merger of equitable and legal powers in the Superior Court. For example, in *Carlisle v. Cooper,* 21 N.J.Eq. 576 (E. & A. 1870), the Court of Errors and Appeals held that equity courts could interfere with nuisance actions brought in law courts "on the ground of restraining irreparable mischief, or of suppressing interminable litigation, or of preventing [a] multiplicity of suits." *Id.* at 579;see also *Smith v. Red Top Taxicab Corp.,* 111 N.J.L. 439, 440-41, 168 A. 796 (E. & A.1933) ("[N]o principle of law is more firmly established than that a single or entire cause of action cannot be subdivided into several claims, and separate actions maintained thereon.").

The 1947 Constitution recognized the doctrine by

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.



providing:

> Subject to the rules of the Supreme Court, the Law Division and the Chancery Division shall each exercise the powers and functions of the other division when the ends of justice so require, and legal and equitable relief should be granted in any cause so that all matters in controversy between the parties may be completely determined.
>
> [*N.J. Const.* art. VI, § 3, ¶ 4.]

The requirement of the mandatory joinder of claims has evolved continually since the adoption of the 1947 Constitution. In **638 *Steiner v. Stein,* 2 N.J. 367, 66 A.2d 719 (1949), the Court recognized that to administer justice efficiently, the Chancery Division should adjudicate legal issues, even if related equitable issues have already been determined. *Id.* at 378, 66 A.2d 719; *see also Tumarkin v. Friedman,* 17 N.J.Super. 20, 24, 85 A.2d 304 (App.Div.1951) (finding that county court had full authority to hear legal and equitable issues). In *Ajamian v.Schlanger,* 14 N.J. 483, 103 A.2d 9, *cert. denied,* 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954), the Court held that a plaintiff's failure to bring a claim for damages in a prior proceeding where the plaintiff sought rescission of an allegedly fraudulent contract required preclusion of the damages action "if the policy to avoid undue litigation is not to be emptied of substance." *Id.* at 488,103 A.2d 9.

*433 The Court eventually broadened the doctrine to include the mandatory joinder of defenses and counterclaims. *See Massari v. Einsiedler,* 6 N.J. 303, 313, 78 A.2d 572 (1951) (holding that party was barred from bringing reformation action in second suit when party had adequate opportunity to present equitable defenses in original action); *Vacca v. Stika,* 21 N.J. 471, 476, 122 A.2d 619 (requiring representative parties to assert counterclaims in one suit). In 1977, the Appellate Division in *Wm. Blanchard* held that the entire controversy doctrine requires that defendants assert all cross-claims as well as counterclaims arising out of the underlying transaction. *Wm. Blanchard, supra,* 150 N.J.Super. at 294, 375 A.2d 675.

[2] Thus, the entire controversy doctrine encompasses "virtually all causes, claims, and defenses relating to a controversy" between parties engaged in litigation. *Cogdell v. Hospital Ctr.,* 116 N.J. 7, 16, 560 A.2d 1169 (1989). Mandatory joinder of claims was

incorporated into the rules of court in 1979. *See R.* 4:27-1(b) (providing for mandatory joinder of claims as required by the entire controversy doctrine), *superseded by R.* 4:30A (September 1990); *see also R.* 4:7 (making mandatory counterclaims not asserted subject to preclusion under *R.* 4:30A).

The mandatory joinder of parties has evolved more slowly. *See, e.g., Thornton v. Potamkin Chevrolet,* 94 N.J. 1, 5, 462 A.2d 133 (1983) (finding that "[t]he essence of [the judicial] policy [behind the entire controversy doctrine] is the joinder of claims and not parties"); *Aetna Ins. Co. v. Gilchrist Bros., Inc.,* 85 N.J. 550, 558, 428 A.2d 1254 (1981) (reasoning that "the preclusive effect of nonjoinder of claims arising out of a single dispute or wrong between the parties may not automatically be applied to a failure to join a person as a party to the action"). In *Crispin v. Volkswagenwerk, A.G.,* 96 N.J. 336, 343, 476 A.2d 250 (1984), however, we held that "the joinder of known responsible parties in a single action be the norm." Because the doctrine is one of judicial fairness, we decided to proceed step-by-step in extending it to parties. *Ibid.*

*434 Our decision in *Cogdell* to require the mandatory joinder of all parties with a material interest in a legal controversy proceeded logically from *Crispin. See Cogdell, supra,* 116 N.J. at 26, 560 A.2d 1169 ("We thus conclude that the entire controversy doctrine appropriately encompasses the mandatory joinder of parties."). In *Cogdell,* we noted that the purposes underlying the claims-joinder rule "are similar, if not identical to those of the party-joinder rule." *Id.* at 19, 560 A.2d 1169. In particular, mandatory party joinder assures that all potentially responsible persons will participate in the original action. *Id.* at 25, 560 A.2d 1169. Requiring the joinder of all parties with a material interest in a litigation thus guarantees a complete determination of liability, avoids prejudice to absent parties, and prevents a duplication of lawsuits. *Id.* at 25-26, 560 A.2d 1169. The touchstone of mandatory party-joinder is fairness both to the plaintiff and to the defendant. *DiTrolio, supra,* 142 N.J. at 272, 662 A.2d 494.

Shortly after our decision in *Cogdell,* we adopted *Rule* 4:30A, codifying the mandatory joinder of both claims and parties. *Rule* 4:30A provides:

> Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.



696 A.2d 633                                                                                              Page 6
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by *R.* 4:64-5 (foreclosure actions) and *R.* 4:67-4(a) (leave required **639 for counterclaims or cross-claims in summary actions).

In a sense, *Rule* 4:30A advances the purpose of *Rule* 4:5-1, which requires each party to submit with its first pleading a certification whether the matter in controversy is the subject of any other action pending or whether any other action is contemplated. *R.* 4:5-1(b)(2). *Rule* 4:5-1 further requires that each party shall disclose in the certification the names of any other party who should be joined in the action. *Ibid.* Under that Rule, the court, either on its own motion or that of a party, may compel the joinder of parties in appropriate circumstances. *Ibid.* Since deciding *Cogdell,* this Court has continued to require the mandatory joinder of all parties with a material interest in a litigation. *See \*435Mortgageling Corp. v. Commonwealth Land Title Ins. Co.,* 142 N.J. 336, 662 A.2d 536 (1995) (barring claims against parties omitted from earlier action in another jurisdiction if jurisdiction was available in first forum); *Mystic Isle Dev. Corp. v. Perskie & Nehmad,* 142 N.J. 310, 662 A.2d 523 (1995) (barring legal-malpractice claims arising from real estate development suit because developer failed to join attorneys as defendants in first litigation); *Circle Chevrolet, supra,* 142 N.J. at 280, 662 A.2d 509 (1995) (barring attorney-malpractice claims for failure to join attorneys and assert claims in the underlying action against landlord for reformation of commercial lease agreement); *DiTrolio, supra,* 142 N.J. at 279, 662 A.2d 494 (barring physician's suit against members of hospital staff because of failure to join them as defendants in prior suit against hospital). *But see Joel v. Morrocco,* 147 N.J. 546, 688 A.2d 1036 (1997) (finding that failure to join individual partners in zoning dispute did not preclude enforcement against individual partners of partnership's money obligations under settlement reached in zoning dispute).

### III.

The Appellate Division held that Olds's legal-malpractice claim did not accrue until the medical-malpractice complaint was dismissed with prejudice. Reasoning that the entire controversy doctrine does not apply to claims that are unaccrued at the time of the underlying litigation, the court concluded that the doctrine did not bar Olds's

legal-malpractice claim against *Donnelly.* 291 N.J.Super. at 232, 677 A.2d 238. We agree that the entire controversy doctrine does not preclude this action.

Our analysis begins with *Circle Chevrolet,* in which we held that the entire controversy doctrine barred Circle's legal-malpractice action. *Circle Chevrolet, supra,* 142 N.J. at 303, 662 A.2d 509. In 1985, Circle and its landlord became involved in a dispute concerning the appropriate size of the annual rent increase. They settled the dispute when the landlord's attorney devised a formula to determine the rent increase. *Id.* at 286, 662 A.2d 509. Circle's attorneys approved the new formula. *Ibid.* In March of 1988, the \*436 attorneys informed Circle that the formula was based on an incorrect reading of the original, thirty-year lease. Circle brought a reformation action against its landlord. *Id.* at 286-87, 662 A.2d 509. During it, Circle's attorneys withdrew as counsel. The litigation settled, and Circle brought a malpractice action against its former attorneys.

Circle argued for an exception to the entire controversy doctrine for attorney-malpractice actions. We held, however, that a client is under a "double onus" to bring his or her claim not only within the requisite statute of limitations period, but also within the boundaries set by the entire controversy doctrine. *Id.* at 291, 662 A.2d 509. In *dicta* we stated that the entire controversy doctrine applies "to a client's legal malpractice claim against his or her attorney, even when the attorney is currently representing the client in an underlying action." *Id.* at 289, 662 A.2d 509; *see also Mystic Isle, supra,* 142 N.J. at 324-25, 662 A.2d 523 (rejecting Mystic's argument that requiring plaintiffs to bring attorney-malpractice claim at same time as underlying action is against public policy).

[3] We further held in *Circle Chevrolet* that the determination of the accrual of a legal-malpractice claim for the purposes of imposing the entire-controversy bar is like the determination of the accrual of the bar of the statute of limitations. *Circle Chevrolet, supra,* 142 N.J. at 296, 662 A.2d 509. That **640 holding drew on our opinion in *Grunwald v. Bronkesh,* 131 N.J. 483, 621 A.2d 459 (1993), which held that the discovery rule triggers the accrual of the statute of limitations for attorney-malpractice actions. *Id.* at 499, 621 A.2d

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

459. The discovery rule involves two elements: actual injury and knowledge of fault. *Id.* at 495, 621 A.2d 459 (using "damage" interchangeably with "injury"). The limitations period begins "when a plaintiff knows or should know the facts underlying [injury and fault], not necessarily when a plaintiff learns the legal effect of those facts." *Id.* at 493, 621 A.2d 459. Thus, an appeal from an adverse judgment does not toll the accrual of a cause of action. *Id.* at 496-97, 621 A.2d 459.

*437 In applying the discovery rule, a court must determine when the plaintiff became aware of the underlying factual basis for the legal-malpractice action. For example, in *Grunwald* we found that the plaintiff discovered his attorney's negligence when the Chancery Division determined that the agreement the attorney drafted was unenforceable. *Id.* at 499, 621 A.2d 459; *see also* **Circle Chevrolet, supra, 142 N.J. at 297, 662 A.2d 509** (finding that Circle Chevrolet discovered before it sued its attorneys for legal-malpractice that its overpayment of rent may have been caused by its attorneys' negligence); *Mystic Isle, supra,* 142 N.J. at 326, 662 A.2d 523 (finding that Mystic Isle knew of existence of malpractice action during course of underlying action).

Here, Olds was aware of Donnelly's alleged negligence, which arose out of the untimely service of the summons and complaint, before the dismissal of the medical-malpractice action in March 1991. In 1988, after Olds received the first notice of dismissal for lack of prosecution, Donnelly advised Olds that Dr. Donahue had not been served. Additionally, in July of 1988, Donnelly wrote to Olds, informing him that he was closing Olds's file and that Donnelly's attempts at mail service on Dr. Donahue had been unsuccessful. Ultimately Olds, acting pro se, effectuated proper service in July 1989.

[4][5][6] Mere knowledge of an attorney's negligence does not cause a legal malpractice claim to accrue. The client must sustain actual damage. *Grunwald, supra,* 131 N.J. at 492, 621 A.2d 459. As an action grounded in tort, "a legal-malpractice action accrues when an attorney's breach of professional duty proximately causes a plaintiff's damages." *Id.* at 495, 621 A.2d 459. Actual damage is "real" not "speculative." *Ibid; see also Mant v. Gillespie,* 189 N.J.Super. 368, 373, 460 A.2d 172 (App.Div.1983) (applying the discovery rule and finding that "the mere

threat or possibility of an unfavorable judgment [does] not represent an actual loss which [can] generate a cause of action"). An adverse judgment may constitute damage. *Grunwald, supra,* 131 N.J. at 495, 621 A.2d 459.

*438 The majority of courts hold that when attorney malpractice occurs during the course of litigation, the cause of action accrues on entry of an adverse judgment in the trial court. *See, e.g., Michael v. Beasley,* 583 So.2d 245, 252 (Ala.1991) (finding that malpractice suit accusing attorney of mishandling prior personal injury suit accrued on date of jury verdict against plaintiffs because "it was at this time that [plaintiffs] sustained legal injury sufficient for them to maintain an action against [defendant]"); *Wettanen v. Cowper,* 749 P.2d 362, 365 (Alaska 1988) (holding that malpractice action alleging that attorney failed to prepare for civil assault trial accrued upon the entry of trial court's judgment because that was when plaintiff incurred actionable harm); *Treasure Valley Bank v. Killen & Pittenger,* 112 Idaho 357, 732 P.2d 326, 328 (1987) (finding that malpractice action regarding attorney's negligent misrepresentation in bankruptcy proceeding accrued on date bankruptcy court confirmed bankruptcy plan submitted by debtor); *Zupan v. Berman,* 142 Ill.App.3d 396, 96 Ill.Dec. 889, 892, 491 N.E.2d 1349, 1352 (1986) (holding that malpractice action against attorney who defended plaintiff in dram shop action accrued on date trial court entered judgment adverse to the client); *Price v. Becker,* 812 S.W.2d 597, 598 (Tenn.Ct.App.1991) (reasoning that malpractice action alleging that attorney failed to exercise reasonable care in preparing plaintiff's case accrued on date plaintiff's prior action was dismissed).

**641[7] In the present case, the trial court's dismissal of Olds's medical-malpractice complaint for untimely service was not mandatory. *Rule* 4:4-1 states that "[i]f a summons is not issued within 10 days after the filing of the complaint the action *may* be dismissed." (emphasis added). Generally, a violation of the ten-day rule will not result in dismissal of an action when the defendant is not prejudiced, the complaint appears meritorious, and the failure to make proper service is attributable solely to the neglect of the plaintiff's attorney. *McLaughlin v. Bassing,* 51 N.J. 410, 241 A.2d 450 (1968). Indeed, dismissal is reserved for those situations where "no lesser sanction will erase the prejudice *439 suffered by the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.



696 A.2d 633
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

Page 8

non-delinquent party." *Crispin, supra, 96 N.J. at 345, 476 A.2d 250.* Dr. Donahue was not served until two years and one month after the filing of the complaint. In another case, however, we permitted service two and one-half years after filing. *McLaughlin, supra, 51 N.J. at 411, 241 A.2d 450.* Thus, the passage of time alone did not compel the dismissal of Olds's medical-malpractice action.

[8] Because the dismissal of Olds's medical-malpractice complaint was not a foregone conclusion, Donnelly's negligence did not proximately cause actual damage to Olds until the trial court actually dismissed Olds's complaint against Dr. Donahue in 1991. Only then did Olds suffer real and substantial, as opposed to speculative, damage. *See Grunwald, supra, 131 N.J. at 495, 621 A.2d 459* (reasoning that actual damage is "real" not "speculative"). To trigger the statute of limitations, only the fact, not the amount of damages need be certain. *See Adams v. Paul, 11 Cal.4th 583, 46 Cal.Rptr.2d 594, 598, 904 P.2d 1205, 1209 (1995)* (reasoning that fact of damage rather than amount is relevant consideration for determining when statute of limitations is triggered for an attorney-malpractice claim). Not until the dismissal of the medical-malpractice action was damage to Olds certain. In **Circle Chevrolet** and **Mystic Isle,** in comparison, the fact of the plaintiffs' economic damages (Circle's overpayment of rent and Mystic's failed development project) existed prior to the plaintiffs' discovery of the defendants' alleged negligence. *See Budd v. Nixen, 6 Cal.3d 195, 98 Cal.Rptr. 849, 853, 491 P.2d 433, 437 (1971)* (reasoning that "[o]rdinarily the client has already suffered damage when he discovers his attorney's negligence").

Olds's legal-malpractice claim against Donnelly did not accrue for either statute-of-limitations or entire-controversy purposes until the dismissal with prejudice of the medical-malpractice action in March 1991. Consequently, the entire controversy doctrine imposed no obligation on Olds to join Donnelly in the underlying medical-malpractice action. *See DiTrolio, supra, 142 N.J. at 273-74, 662 A.2d 494* (reasoning that entire controversy doctrine does *440 not apply to unknown or unaccrued claims). Olds filed this legal-malpractice lawsuit in April of 1992, thirteen months after the action accrued and well within the six-year limitations period prescribed by

*N.J.S.A.* 2A:14-1. Thus, the statute of limitations also presents no barrier to this legal-malpractice action.

IV.

We are aware of the criticism of **Circle Chevrolet's** expansion of the entire controversy doctrine to attorney-malpractice actions. In particular, critics have pointed out the adverse effect on the attorney-client relationship from requiring the joinder of an attorney who continues to represent a client in an underlying action. *See, e.g.,* Geoffrey C. Hazard, Jr., *AnExamination Before and Behind the "Entire Controversy" Doctrine, 28 Rutgers L.J. 7, 24 (1996)* (questioning expansion of complicated litigation to include an attack on a party's own lawyer); Albert L. Cohn & Terri A. Smith, *Practice and Malpractice after Circle Chevrolet: Some Practical Considerations of the Entire Controversy Doctrine, 28 Rutgers L.J. 78, 84 (1996)* (stating inclusion of legal-malpractice claims in entire controversy doctrine creates potentiality that lawyers and clients will become adversaries).

Candor compels that we acknowledge that the application of the entire controversy doctrine to legal-malpractice claims has not fulfilled our expectations. First, application of the doctrine can chill attorney-**642 client relations. The attorney, formerly the client's advocate, is made the adversary. The client is forced to expend time and money to engage a second attorney to pursue the attorney-malpractice claim. Because the first attorney is now a potential witness, that attorney's own interests are no longer aligned with those of the client. Although we do not suggest that potentially negligent attorneys would misrepresent facts, an attorney charged with malpractice, like any other litigant, would have an incentive to testify guardedly when sued by a former client.

Thus, clients are put in the untenable position of either pursuing a claim against their attorney, whose negligence may never result *441 in an unfavorable outcome, or forever forgoing a legal-malpractice action. Clients who are satisfied with their attorneys and want to maintain an otherwise satisfactory relationship may forgo the right to sue. That result does not provide the fairness that the entire controversy doctrine is designed to encourage. *See Joel, supra, 147 N.J. at 555, 688 A.2d 1036* (stating that twin pillars of entire controversy doctrine are

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

E 8

fairness to parties and to system of judicial administration).

Furthermore, the requirement that clients join their attorneys in the original lawsuit jeopardizes attorney-client confidences. When clients sue their attorneys, attorney-client communications may become discoverable. *See RPC* 1.6(c)(2) (allowing attorney to reveal client confidences "to establish a defense to a ... civil claim ... against the lawyer based upon the conduct in which the client was involved"); *N.J.R.E.* 504(2)(c) (stating that attorney-client privilege shall not extend "to a communication relevant to an issue of breach of duty by the lawyer to his client, or by the client to his lawyer"); *N.J.S.A.* 2A:84A-20(2)(c) (same). Thus, the lawyer can be questioned about otherwise privileged information involving the very subject matter of the underlying litigation.

In **Circle Chevrolet,** we anticipated that the *Rules of Professional Conduct* would minimize the risks of the disclosure of attorney-client communications. Those *Rules* state that a lawyer sued for malpractice is obligated to reveal privileged communications only to the extent necessary to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client. *Circle Chevrolet, supra,* **142 N.J. at 293, 662 A.2d 509;***RPC* 1.6(c)(2). We also anticipated that the attorney-malpractice claim need not actually be litigated with the underlying action. Our expectation was that once an attorney notified a client of a possible malpractice claim, the trial court would have the discretion to manage the case. *Circle Chevrolet, supra,* **142 N.J. at 293, 662 A.2d 509**. On further consideration, however, we believe that the risk of the disclosure of privileged information and the generally adverse effects on attorney-client relationships outweigh any *442 benefit from requiring a client to assert a malpractice claim in the pending lawsuit.

With transactional malpractice, such as negligence in drafting a contract or will or performing a real estate closing, the need for an exception to the entire controversy doctrine is not as compelling. The attorney is not saddled with the conflicting roles of advocating on behalf of the client in the underlying litigation and representing his or her own interests as a defendant. Moreover, a legal-malpractice claim alleging transactional negligence is a claim against a primary tortfeasor. As such, the entire controversy doctrine's purposes are served by requiring plaintiffs to notify the trial court of their potential malpractice claims. The attorney, like the other defendants, is a potential cause of a plaintiff's damages. *See Circle Chevrolet, supra,* **142 N.J. at 286-87, 662 A.2d 509** (characterizing attorneys' negligence as involving an erroneous interpretation of a lease clause); *Mystic Isle, supra,* 142 N.J. at 320-21, 662 A.2d 523 (describing plaintiff's allegations that its attorneys inappropriately represented plaintiffs in the attorneys' attempts to obtain sewage permits).

The line between transactional and litigation representation, however, is not always clear. Often, the same law firm or even the same attorney may represent a client in both transactional and litigation matters. Thus, transactional attorneys and their firms often have a ongoing relationship with their clients. Requiring a client to notify a trial court of a **643 potential malpractice claim relating to one transaction when the attorney or firm continues to represent the client on other matters can intrude unduly on the attorney-client relationship.

[9] Basing the application of the entire controversy doctrine on the nature of the alleged malpractice would be difficult to administer. The better response is not to distinguish litigation malpractice from other kinds of malpractice, but to exempt all attorney-malpractice actions from the entire controversy doctrine. The *Rules of Professional Conduct* still require an attorney to notify the client that he or she may have a legal-malpractice claim even if *443 notification is against the attorney's own interest. *See RPC* 1.7(b)(2) ("[a] lawyer shall not represent a client if the representation of that client may be materially limited by the ... lawyer's own interests, unless ... the client consents after a full disclosure of the circumstances and consultation with the client."); *see also Draft Restatement (Third) of the Law Governing Lawyers* § 31, cmt. c (1996) ("If the lawyer's conduct of the matter gives the client a substantial malpractice claim against the lawyer, the lawyer must disclose that to the client."). In sum, we conclude that the entire controversy doctrine no longer compels the assertion of a legal-malpractice claim in an underlying action that gives rise to the claim.

V.

[10] Donnelly urges this Court to reinstate the



696 A.2d 633                                                                                          Page 10
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

third-party complaint against Maran. That complaint alleges that Maran's negligence caused the dismissal of Olds's complaint against Dr. Donahue.

We decline to hold that Maran, as the successor attorney, owed his predecessor, Donnelly, a duty of care. The trial court, in dismissing the third-party complaint, found that Maran was not responsible for any prejudice to Dr. Donahue resulting from the untimely service. In *Malewich v. Zacharias, 196 N.J.Super. 372, 482 A.2d 951 (App.Div.1984),* the plaintiff sued her first attorney for malpractice. The first attorney filed a third-party complaint against the plaintiff's second attorney, arguing, as Donnelly does, that the second attorney acted negligently in handling the underlying litigation. *Id. at 375, 482 A.2d 951.* The Appellate Division held, however, that the successor attorney did not owe to his predecessor a duty that would support a third-party complaint for negligence. *Ibid.*

Other jurisdictions have held that third-party or cross-complaints filed by an original attorney against a subsequent attorney undermine the subsequent attorney's undivided loyalty to the client. *See, e.g.,* *\*444Gibson, Dunn & Crutcher v. Superior Court of Los Angeles County, 94 Cal.App.3d 347, 156 Cal.Rptr. 326, 330 (1979)* (holding that to expose attorney to negligence brought by parties other than client "would inject undesirable self-protective reservations into the attorney's counseling role and tend to divert the attorney from single-minded devotion to his client's interests"); *Goldfisher v. Superior Court, 133 Cal.App.3d 12, 183 Cal.Rptr. 609, 615 (1982)* (finding that "to encourage claims of indemnification where two lawyers successively represented the same client is not for the benefit of the client" because the "inevitable consequence is a corrosion of the sacred attributes of complete confidentiality and undivided loyalty which are the heart of the relationship between lawyer and client"); *Hughes v. Housley, 599 P.2d 1250, 1252 (Utah 1979)* (finding that, as a matter of policy, no duty should be imposed upon succeeding counsel in favor of preceding counsel: "to impose such a duty would be to subject the second attorney to potential conflicts of interest in trying to serve two masters"). We affirm the Appellate Division's holding that the trial court properly dismissed the third-party complaint. *292 N.J.Super. at 372, 678 A.2d 1152.*

VI.

The NJSBA has suggested in its amicus brief that we abolish mandatory party joinder and amend *Rule* 4:30A by deleting the words "or parties." Similarly, our concurring colleague recommends overruling *Cogdell's* rule of preclusion. *Post at 450-51, 472, 696 A.2d at 646-47, 658.* By comparison, Professor Hazard apparently approves of a rule of preclusion, but would sustain it under **\*\*644** expanded notions of *res judicata* and collateral estoppel, not by recourse to the entire controversy doctrine. Hazard, *supra, 29 Rutgers L.J. at 18-19.*

Critics of the doctrine assert that its requirement of mandatory party joinder is counterproductive. According to them, mandatory party joinder complicates, prolongs, and increases the cost of litigation. *Economy, economy shalt thou follow, 6 N.J.L. 558 (March 10, 1997)* (editorial); Allan R. Stein, *\*445Commentary: Power, Duty and the Entire Controversy Doctrine, 28 Rutgers L.J. 27, 39-40 (1996).* They state the doctrine generates uncertainty and is too difficult for lawyers and judges to understand. Hazard, *supra, 28 Rutgers L.J. at 7.* Also, they contend that the doctrine impairs valuable relationships by requiring the assertion of claims against parties one otherwise would not sue. Allan R. Stein, *Is New Jersey Out on a Limb With the Entire Controversy Doctrine?, 182 N.J.L. 12, 14 (Jan./ Feb.1997).* Finally, they assert that the preclusion of a claim because of the failure to assert the claim in an earlier proceeding is overkill. Stein, *supra, 28 Rutgers L.J. at 30.*

The critics also contend that the doctrine proceeds from the incorrect assumption that mandatory party joinder is necessary to avoid unfairness to absent defendants and others. *Id. at 33.* Finally, the critics question the premise that a plaintiff controls the initial proceeding. Hazard, *supra, 28 Rutgers L.J. at 21-22;* Stein, *supra, 182 N.J.L. at 14;* Stein, *supra, 28 Rutgers L.J. at 37.*

Much of the criticism is anecdotal. Susan Carboni, *The Entire Controversy Opinions of 1995 and Attorney Malpractice: What Price Economy in New Jersey?, 48 Rutgers L.Rev. 1273, 1313 n. 241 (1996).* Some may be exaggerated or speculative.

One suggestion is to expand party joinder under *Rule* 4:28, which is identical to *Federal Rule of Civil*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

E 10

696 A.2d 633    Page 11
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

_Procedure_ 19. The underlying principle is that more aggressive joinder of parties in the original action would obviate preclusion under the entire controversy doctrine in a second action. Some argue that expanded joinder under _Rule_ 4:28 is a mutually exclusive alternative to the entire controversy doctrine under _Rule_ 4:30A. _Post_ at 461-63, 696 A.2d at 652-54; _cf._ John W. Reed, _Compulsory Joinder of Parties in Civil Actions,_ 55 _Mich.L.Rev._ 327, 335, 337 (1957). Others suggest that the two rules complement each other. Rochelle Cooper Dreyfuss & Linda J. Silberman, _Interjurisdictional Implications of the Entire Controversy Doctrine,_ 28 _Rutgers L.J._ 123, 154-55 n. 159 (1996). Unifying the various suggestions is the *446 premise that party-joinder requirements are an important part of efficient judicial administration.

Thoughtful analysis of the alternatives moves us beyond the facts of this case. The wealth of suggestions deserves our careful consideration. Our biennial review of proposed amendments to the Rules of Practice, which we will undertake next term, provides a suitable occasion to review proposals for modifications of the entire controversy doctrine, expanded use of party joinder, and other suggestions to improve the administration of justice. The Civil Practice Committee, to which we regularly look for recommendations on proposed rule changes, already has appointed a subcommittee on the entire controversy doctrine. That subcommittee is the logical entity to consider initially the various proposals concerning the doctrine.

Like other legal doctrines, the entire controversy doctrine continues to evolve. _See Crispin, supra,_ 96 _N.J._ at 343, 476 _A.2d_ 250 (stating we will "proceed on a step-by-step basis recognizing that the doctrine is one of judicial fairness...."). For policy considerations, we have recognized that the doctrine should not apply in certain contexts such as non-germane claims against a mortgagor in a mortgage foreclosure, _Rule_ 4:30A, and indemnification claims when the putative indemnitee complies with _N.J.S.A._ 12A:2- 607(5)(a). _Harley Davidson Motor Co., Inc. v. Advance Die Casting, Inc., et al.,_ 150 _N.J._ 489, 500, 696 _A.2d_ 666, 672 (1997). Consistent with that approach, we confine our holding in this case to attorney-malpractice claims, without reaching other claims, such as "second-litigation malpractice claims against accountants, architects, engineers, physicians,

or psychologists." _Post_ at 451, **645 696 A.2d at 647. For present purposes, we note simply that legal malpractice claims uniquely raise the specter of forcing a party in an action to sue the same lawyer who is representing that party in the action.

[11] We have always emphasized that preclusion is a remedy of last resort. _See Gelber v. Zito Partnership,_ 141 _N.J._ 561, 565, 688 _A.2d_ 1044 (1997) (finding that "[c]ourts must carefully analyze" both fairness to the *447 parties and fairness to the system of judicial administration "before dismissing claims or parties to a suit"). The purpose of the doctrine is not to bar meritorious claims, but to encourage litigants to bring to the attention of trial courts persons who should be joined in a proceeding. _See id._ at 567, 688 _A.2d_ 1044 (stating "the purpose of the rule is not just to notify a new party of the imminence of a future law suit, the purpose of the rule is to secure the coordination and consolidation of all litigation emanating from a single controversy through the joinder of all participants in that controversy in a current action and to subject joinder issues to the supervisory authority of the court"); _Petrocelli v. Daniel Woodhead Co.,_ 993 _F.2d_ 27, 31 (3d Cir.1993) (entire controversy doctrine does not require that all claims and parties culminate in one litigation; rather, all claims and parties must initially be joined together for the court, which can then determine how to proceed with various claims and parties); _cf. Brown v. Brown,_ 208 _N.J.Super._ 372, 382, 506 _A.2d_ 29 (App.Div.1986) (stating "we therefore hold that a party whose constituent claim arises during the pendency of the action risks its loss unless he appraises the court and his adversary of its existence and submits to judicial discretion the determination of whether it should be joined in that action or reserved"). Essentially, the point is to require submission of issues concerning joinder to the discretion of the trial court, which then can decide how best to manage them.

Some contend that the dominant consideration with party joinder should be the freedom of claimants to decide what defendants to join in an action. They theorize that most plaintiffs' attorneys rationally want to join as many parties as possible, _post_ at 427, 696 _A.2d_ at 650, Hazard, _supra,_ 28 _Rutgers L.J._ at 21. The reality, however, is that some attorneys have elected to conceal, _Crispin, supra,_ 96 _N.J._ 336, 476 _A.2d_ 250, or withhold, _Cogdell, supra,_ 116 _N.J._ 7, 560 _A.2d_ 1169, claims against additional parties. That

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.



696 A.2d 633                                                                                                    Page 12
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

practice reveals the limitations of party joinder under *Rule* 4:28. It also illustrates the need for a procedural device, such as *Rule* 4:30A, to protect parties, the courts and the public from excessive and costly litigation. See *\*448* Gelber, supra, 147 N.J. at 565, 688 A.2d 1044 (stating "the twin pillars of the entire controversy doctrine are fairness to the parties and fairness to the system of judicial administration"); *Prevratil, supra, 145 N.J. at 197, 678 A.2d 243* (stating "one of the twin pillars of the entire controversy doctrine is fairness"). In that limited context, when no lesser remedy would suffice, a court may resort to preclusion. So perceived, mandatory joinder should not be confused with mandatory preclusion. See *Post* at 457, 696 A.2d at 650 (stating that the Court "adopted a preclusive mandatory party-joinder rule" in *Cogdell*).

[12] Before precluding a second action, a court must determine whether the plaintiff in the earlier action was required to notify the court of the party alleging preclusion. See *DiTrolio, supra, 142 N.J. at 271, 662 A.2d 494* ("the determinative consideration is whether distinct claims are aspects of the single larger controversy because they arise from interrelated facts."). If notice was required, the court must discern whether the plaintiff complied with the requirements of the rules in the prior litigation. Although unnecessary, a formal motion under *Rule* 4:28 to join a party would suffice. The plaintiff need only notify the first trial court of the party now alleging preclusion. Failure to comply with those requirements need not lead to preclusion of the second action. *Gelber, supra, 147 N.J. at 565, 688 A.2d 1044* ("[T]he court did not intend the violation of the notice requirements of *Rule* 4:5-1 should result in automatic orders for dismissal."). If a remedy other than preclusion will vindicate the cost or prejudice to other parties and the judicial system, the court should employ such a remedy. Cf. *Abtrax Pharmaceuticals, Inc. v. Elkins-Sinn, Inc., 139 N.J. 499, 514, 655 A.2d 1368 (1995)* ("Since dismissal **646 with prejudice is the ultimate sanction, it will normally be ordered only when no lesser sanction will suffice to erase the prejudice suffered by the non-delinquent party....").

Our endeavor from the outset has been to temper efficiency with individual justice. So viewed, mandatory party joinder under the entire controversy doctrine works best in litigation arising *\*449* from an identifiable event that may have multiple causes, such as an automobile accident or a product failure, or from a project based on an agreement or related agreements, such as the construction of a building.

As previously indicated, our Committee on Civil Practice has appointed an Entire Controversy Doctrine Subcommittee to examine exemptions from mandatory party joinder under the entire controversy doctrine. We are asking the Committee to broaden the examination to include all other aspects of the doctrine. Consistent with our traditional practice, we shall provide the opportunity for the bar and others to comment on any modification of the entire controversy doctrine, including any proposed amendment to *Rule* 4:30A.

### VII.

[13] The parties have not briefed or argued the issue whether the within decision should apply retroactively or prospectively. In fairness to other litigants and the judicial system, however, we conclude that our decision should apply not only to the present case, but to all pending cases, whether on appeal or in the trial courts.

[14][15] Ordinarily, judicial decisions apply retroactively. *Crespo v. Stapf, 128 N.J. 351, 367, 608 A.2d 241 (1992)*. Policy considerations may justify giving a decision limited retroactive effect. *Ibid.* The first consideration is whether litigants reasonably have relied on settled law in ordering their affairs. *Id. at 368, 608 A.2d 241*. Another consideration is whether retroactive application will advance the purposes of the rule announced in the decision. *Id. at 370, 608 A.2d 241*. "The final consideration is whether retroactive application would produce inequitable results and adversely affect the administration of justice." *Id. at 371, 608 A.2d 241*.

Here, those considerations point toward limited or "pipeline" retroactivity of our decision. First, we decided *Circle Chevrolet* *450 only two years ago, a factor that affects the extent to which litigants reasonably have relied on the application of the entire controversy doctrine to legal-malpractice claims. Second, the general purpose of the legal-malpractice exception is to preserve the attorney-client relationship. Limited retroactivity will adequately protect existing relationships. Giving the benefit of our decision to litigants with pending cases serves the interests of justice by permitting resolution

E 12

696 A.2d 633                                                                                      Page 13
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

of their claims on the merits. Complete retroactivity, however, potentially would expose the judicial system to the undue burden of resolving numerous concluded matters.

The judgment of the Appellate Division is affirmed.

STEIN, J., concurring in part and dissenting in part.

The old adage that "the squeaky wheel gets the grease" perhaps offers the simplest explanation for the Court's disposition of these related entire controversy appeals. The general criticism of the preclusive application of the entire controversy doctrine to party joinder has been mild in comparison with the organized bar's criticism of the holding in *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla*, 142 N.J. 280, 303, 662 A.2d 509 (1995), requiring a client to assert a malpractice claim against its former attorney in the same adversarial litigation that would determine whether the attorney's alleged negligence caused the client damage. Acknowledging that "application of the entire controversy doctrine to legal malpractice claims has not fulfilled our expectations," *ante* at 440, 696 A.2d at 641, the Court, electing to treat a symptom rather than the underlying ailment, holds that attorney-malpractice claims are exempt from the entire controversy doctrine, *ante* at 443-44, 696 A.2d at 643-44.

The blanket exemption of legal malpractice claims from the preclusive effects of the party joinder segment of the entire controversy **647 doctrine is an expedient course correction that will calm the bar and eliminate one of the most visible and unsettling applications of the doctrine. As others have observed, however, *451 such an exemption would appear to be difficult to justify. Nancy J. Moore, *Implications of Circle Chevrolet for Attorney Malpractice and Attorney Ethics,* 28 *Rutgers L.J.* 57, 76-77 (1996). On what principled basis can our courts require dismissal of second-litigation malpractice claims against accountants, architects, engineers, physicians or psychologists that were omitted improperly from the initial suit, while simultaneously allowing similar claims against lawyers to be adjudicated on the merits? Or from another perspective, why does the Court permit only lawyers' clients to await the outcome of the first litigation before filing suit, while requiring clients of other professionals to join the advisor in the first suit

or risk preclusion of the claim?

Our Court's recent experience with the mandatory party joinder prong of the entire controversy doctrine persuasively leads me to the conclusion that the root of the problem does not lie in the doctrine's application to attorney-malpractice claims. Rather, the fundamental flaw in our approach to party joinder is that the preclusive aspect of the entire controversy doctrine is not the appropriate mechanism to enforce whatever level of mandatory party joinder the Court ultimately deems to be essential. I was a member of the unanimous Court that decided *Cogdell v. Hospital Center at Orange,* 116 N.J. 7, 560 A.2d 1169 (1989). I now regard as erroneous *Cogdell*'s holding that the entire controversy doctrine "necessarily embraces ... joinder of all persons who have a material interest in the controversy," *id.* at 26, 560 A.2d 1169, and its corollary holding that, prospectively, failure to join such parties constitutes a bar to a second independent action against them, *id.* at 13, 28, 560 A.2d 1169.

Our *Cogdell* opinion did not acknowledge adequately the significantly different viewpoints about the extent to which mandatory party joinder is a useful and desirable mechanism for the efficient management of civil litigation. *See* Memorandum from the Subcommittee on Compulsory Joinder of Parties to the Civil Practice Committee 2 (March 1, 1984) (Civil Practice Committee Memorandum) ("[I]t is the opinion of the subcommittee that judicial economy *452 is best served in the context of parties by not requiring joinder. The primary reason is the likelihood that such an extension of the doctrine would unnecessarily complicate and delay most litigation."). But putting aside for the moment any debate about the wisdom of mandatory party joinder, the *Cogdell* opinion never addressed the question whether preclusion of the second cause of action against the omitted party is the best or only mechanism for enforcing party joinder. Rather, the *Cogdell* opinion assumed that if joinder of parties materially interested in the litigation was a desirable goal, its implementation could be achieved only by precluding subsequent suits against omitted parties.

I now believe that assumption to be fundamentally unsound. Neither the federal courts nor any other state court--with the possible exception of Kansas--has adopted a preclusive rule similar to our

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

E 13

696 A.2d 633
150 N.J. 424, 696 A.2d 633
(Cite as: 150 N.J. 424, 696 A.2d 633)

Page 14

entire controversy doctrine as a means of enforcing mandatory party joinder. See David C. Zuckerbrot, *Mandatory Joinder of Parties: The Wave of the Future?*, 43 *Rutgers L.Rev.* 53, 65-69 (1990) (discussing Kansas's "one-action rule," which is related to that state's comparative negligence scheme). Party joinder is not brain surgery, and the extent to which party joinder should be encouraged and the means of achieving it are questions that also confront every other judicial system throughout the country.

The recognition that no other jurisdiction has seen fit to adopt a preclusive rule like our entire controversy doctrine to achieve party joinder is reason enough for us to question the wisdom of the assumptions underlying *Cogdell*. But our experience in applying the entire controversy doctrine to party joinder after *Cogdell* should overcome any lingering doubt about whether we were right or wrong. Although intended to promote judicial efficiency and economy, *Cogdell* unintentionally has created an entirely new layer of trial and appellate court litigation to resolve whether the omission of a party in a prior suit was of sufficient consequence to **648 justify preclusion of subsequent litigation against that party. This *453 term alone our Court will issue published opinions in six party-joinder entire controversy appeals and will have reviewed numerous petitions for certification raising similar issues. In excess of fifty opinions on the issue have been published by trial and appellate courts since *Cogdell* was decided. Nevertheless, the Court's opinion in this appeal demonstrates its continuing sense of uncertainty about the appropriate contours of a preclusive party-joinder doctrine, the Court electing to refer the problem to an Entire Controversy Doctrine Subcommittee of the Committee on Civil Practice to make recommendations. *Ante* at 449, 696 *A.2d* at 646. Respectfully, we do not need a committee or a subcommittee to tell us that the preclusive aspect of the entire controversy doctrine no longer should be applied to party joinder and that, like other jurisdictions, we should use less intrusive measures to encourage an appropriate level of party joinder in civil litigation.

I
A

To begin at the beginning, any misperception that the preclusive application of the entire controversy doctrine to mandatory party joinder is in some respect

authorized or even encouraged by the 1947 Constitution permanently should be dispelled. Our *Cogdell* opinion hinted at such a constitutional pedigree: "The doctrine has become such a fundamental aspect of judicial administration, it has achieved constitutional confirmation." *Cogdell, supra, 116 N.J. at 15, 560 A.2d 1169*.

This court's pre-*Cogdell* opinions stated clearly that the so-called entire controversy doctrine was not a rule of party joinder. *See Thornton v. Potamkin Chevrolet, 94 N.J. 1, 5, 462 A.2d 133 (1983)* ("The essence of that [single controversy] policy is the joinder of claims and not parties."); *Aetna Ins. Co. v. Gilchrist Bros., Inc., 85 N.J. 550, 559, 428 A.2d 1254 (1981)* ("Our research has not disclosed any case in this State where the single controversy *454 doctrine precluded a second action because of a failure to join parties."). More to the point, those who have focused on the history of the doctrine confirm that its objectives were not at all related to party joinder. "Neither the historical situation from which the single controversy doctrine arose nor the policy considerations which engendered the single controversy doctrine in relation to the mandatory joinder of claims compels or suggests the extension of that doctrine to the mandatory joinder of parties." Civil Practice Committee Memorandum, *supra*, at 1.

The constitutional provision in question is Article 6, section 3, paragraph 4 of the 1947 Constitution, which states:

Subject to rules of the Supreme Court, the Law Division and the Chancery Division shall each exercise the powers and functions of the other division when the ends of justice so require, and legal and equitable relief shall be granted in any cause so that all matters in controversy between the parties may be completely determined.

Our earliest opinions applying that constitutional provision, such as *Massari v. Einsiedler, 6 N.J. 303, 307-08, 78 A.2d 572 (1951)* and *Ajamian v. Schlanger, 14 N.J. 483, 487-89, 103 A.2d 9, cert. denied, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954)*, verify that the constitutional provision was formulated principally to effectuate the merger of law and equity to the end that both legal and equitable claims could be adjudicated in one proceeding. See Zuckerbrot, *supra*, 43 *Rutgers L.Rev.* at 69-70. Another recent commentary on the question also concluded that the constitutional provision had no bearing on the virtues or vices of



© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

mandatory party joinder:

> Cogdell cites art. VI, sec. III, par. 4 of the 1947
> Constitution for the insight that an entire
> controversy was the designated minimum unit of
> litigation. That section provides that the trial
> divisions of the Superior Court shall each have and
> exercise the full authority of that court, "so that all
> matters in controversy between the parties may be
> completely determined." The text was intended to
> banish the spectacle of cases shuttled between the
> former law courts and the Court of Chancery. The
> phrase "matters in controversy" plainly refers **649
> to claims actually placed in litigation and thus in
> controversy. The other phrase, "between the
> parties," is clearly confined to those already joined
> in the case. To deduce from the Constitution a
> principle of compulsory joinder of claims against
> nonparties, by the measure of the entire controversy,
> is to discover what is simply not there.
> [Editorial, _Entire Controversy, 147 N.J.L.J. 406_
> (Jan. 27, 1997).]

*455 Similarly, the pre-*Cogdell* cases that addressed
directly whether the entire controversy doctrine
applied to party joinder uniformly concluded that it
did not. See _Aetna, supra,_ 85 _N.J._ at 556-60, 428 _A.2d_
1254; _Gareeb v. Weinstein,_ 161 _N.J.Super._ 1, 9-13, 390
_A.2d_ 706 (App.Div.1978); _McFadden v. Turner,_ 159
_N.J.Super._ 360, 368-72, 388 _A.2d_ 244 (App.Div.1978);
_Moss v. Jones,_ 93 _N.J.Super._ 179, 184-85, 225 _A.2d_
369 (App.Div.1966). In _McFadden, supra,_ Judge
Pressler declined to apply the entire controversy
doctrine to party joinder, noting that the party joinder
rule is permissive and not mandatory.

> We reach that conclusion because of our continued
> perception of the entire controversy doctrine as a
> rule of mandatory joinder of claims, not of parties.
> As we understand the doctrine, its essential purpose
> is to assure a party to litigation that that litigation
> will be conclusive as to the entire matter which is its
> real subject. It is in effect a principle of repose
> intended to protect one who is already a party to
> litigation from the expense, delay and harassment
> implicit in multiple successive actions whose
> individual scopes are limited to only a fragment of
> the complete dispute. As we said in _Wm._
> _Blanchard Co. v. Beach Concrete Co., Inc.,_ 150
> _N.J.Super._ 277, 293-294, 375 _A.2d_ 675
> (App.Div.1977), the jurisprudential basis of the
> doctrine is the conception that litigants in an action
> should not be required, after final judgment therein
> is entered, "to engage in additional litigation in

order to conclusively dispose of their respective
bundles of rights and liabilities which derive from a
single transaction or related series of transactions."
Thus the entire controversy doctrine operates, and
was intended to operate, to prevent a party from
being compelled to successively litigate. Being
compelled to successively litigate does not,
however, mean that one may not elect to
successively litigate so long as he has a viable cause
of action to litigate and so long as his election does
not result in another's compulsion.
[159 _N.J.Super._ at 369-70, 388 _A.2d_ 244.]

## B

In the absence of any constitutional provision or
compelling precedent requiring mandatory party
joinder, the most basic question--and one that the
Court, including this member, did not adequately
evaluate in _Cogdell_--is the extent to which mandatory
party joinder is desirable in civil litigation. The
_Cogdell_ court, focusing on the facts before it as well as
those in _Crispin v. Volkswagenwerk, A.G.,_ 96 _N.J._
336, 476 _A.2d_ 250 (1984), assumed that mandatory
party joinder was justified by considerations of
"fairness to parties and judicial efficiency and
economy." *456 _Cogdell, supra,_ 116 _N.J._ at 17, 560
_A.2d_ 1169. In _Cogdell,_ the plaintiff instituted a
malpractice action against an obstetrician and an
emergency-room pediatrician, the jury returning a
verdict for both defendants. The plaintiff
subsequently filed a second suit against the hospital,
several hospital administrators and members of the
operating team. _Id._ at 8-9, 560 _A.2d_ 1169. The
defendants' motion to dismiss the second action under
the entire controversy doctrine was denied, as was
their motion for leave to appeal. _Id._ at 9, 560 _A.2d_
1169. Observing that "[t]he failure to have joined
these defendants in the earlier action seems prejudicial
and unfair," _id._ at 25, 560 _A.2d_ 1169, this Court
adopted a preclusive mandatory party-joinder rule, to
be applied only prospectively, _id._ at 28, 560 _A.2d_
1169. In _Crispin, supra,_ the plaintiff sustained
serious injuries in a three-car collision. He and two
other persons injured in the accident filed suits in
Union County against multiple defendants. 96 _N.J._ at
338-39, 476 _A.2d_ 250. While the suits were pending,
Crispin filed a product-liability complaint in Bergen
County against Volkswagen, but neither issued a
summons nor attempted to **650 join Volkswagen in
the Union County litigation. _Id._ at 339-40, 476 _A.2d_
250. After that litigation was resolved, Crispin served
Volkswagen, resulting in a motion to dismiss based on

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.



696 A.2d 633
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

the entire controversy doctrine. *Id.* at 340-42, 476 A.2d 250. This Court concluded that the entire controversy doctrine should apply to party joinder "in certain limited circumstances." *Id. at 343, 476 A.2d 250.* The Court observed that "where, as here, a litigant knows of a potentially responsible party, and has already sued that party in another action ... [the litigant] should not be permitted to maintain such independent action when a directly related suit is pending." *Ibid.* The Court's ruling applied only prospectively. *Ibid.*

Although the facts of *Cogdell* and *Crispin* might be perceived as supporting a broad, compulsory party-joinder policy, the overriding question about the wisdom of expansive mandatory party joinder is complex and subject to sharply competing points of view. On a fundamental level, some commentators assert that in our adversarial system of justice a judge should occupy a neutral *457 and passive role, devoting his or her energies "to resolving the disputes framed by the litigants." Stephan Landsman, *The Adversary System: A Description and Defense* 3 (1984). The implication is that the parties define the scope of a lawsuit, including the designation of the participating parties. "The parties are preeminent in choosing the forum, designating the proofs, and running the process." *Id.* at 44. An essential element of our adversary system is that "the parties, not the judge, have the major responsibility for and control over the definition of the dispute." Judith Resnik, *Managerial Judges,* 96 *Harv.L.Rev.* 374, 382 (1982).

Whether favoring or disfavoring more expansive party joinder, commentators acknowledge that strategic considerations dictate the party-joinder decisions made by litigants. Ordinarily, plaintiffs prefer to join all possible defendants in one suit, avoiding the expense of successive litigation and simultaneously encouraging the defendants to attempt to assign culpability to each other. See Geoffrey C. Hazard, Jr., *An Examination Before and Behind the "Entire Controversy" Doctrine,* 28 *Rutgers L.J.* 7, 21 (1996); Richard D. Freer, *Avoiding Duplicative Litigation: Rethinking Plaintiff Autonomy and the Court's Role in Defining the Litigative Unit,* 50 *U.Pitt.L.Rev.* 809, 824 (1989).

Plaintiffs who elect to exclude potentially liable defendants from a lawsuit are influenced by other strategic considerations, such as concern about delay or prejudice. See John C. McCoid, *A Single Package for Multiparty Disputes,* 28 *Stan. L.Rev.* 707, 714 (1976). In addition, the joinder of multiple parties and their assertion of multiple claims and defenses makes discovery and trial more complicated and protracted. Freer, *supra,* 50 *U. Pitt. L.Rev.* at 814; Zuckerbrot, *supra,* 43 *Rutgers L.Rev.* at 61-62. Case-specific reasons may also counsel against joinder. Professor Hazard posits that the plaintiff's lawyer in *Cogdell* may have believed that "by not joining the hospital and auxiliary staff people, the plaintiff might obtain less hostile testimony from ... [those] who were in a position to observe how the doctors had *458 handled the operation." Hazard, *supra,* 28 *Rutgers L.J.* at 21. To the extent that court rules override litigants' strategic decisions concerning how a lawsuit should be packaged, a judicial system runs the risk that its generalized party-joinder requirements will be less effective in managing specific cases than would be the discretionary choices of litigants better informed about their specific unit of litigation.

On the other hand, advocates of more expansive party-joinder mechanisms assert that the burden of duplicative litigation on judicial resources is unjustifiable:

If [multiple suits involving the same issue] are dealt with independently, if each is handled as if the others did not exist, one serious consequence is repetitious litigation. The resources devoted to any lawsuit, the efforts of judges, clerks, witnesses, and others, are scarce. Spending them in repeated examination of the issues raised by a single transaction is a waste. Either repetitive litigation requires the expenditure of additional resources on adjudication, or, if expenditure remains constant, it diverts those resources **651 from resolution of other controversies of significance.
[McCoid, *supra,* 28 *Stan. L.Rev.* at 707 (footnote omitted).]

Some commentators endorse the view that expanded application of *res judicata* and collateral estoppel concepts could achieve "the most desirable end result, the adjudication in one lawsuit of all disputes concerning the rights and obligations of all persons who have a judicially recognized interest in the transaction giving rise to the litigation." Herbert Semmel, *Collateral Estoppel, Mutuality and Joinder of Parties,* 68 *Colum. L.Rev.* 1457, 1472 (1968); see

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.



696 A.2d 633
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

McCoid, *supra*, 28 *Stan.L.Rev.* at 714-15.  Expressing similar objectives but focusing essentially on jurisdictional limitations in controversies with multistate elements or involvement of state and federal law, Professors James and Hazard assert: "There is simply no reason why a multiple-claim, multiple-party controversy arising within the United States should not be submissible to a single tribunal for a consistent adjudication of the various claims and liabilities."  Fleming James, Jr. & Geoffrey C. Hazard, Jr., *Civil Procedure* § 10.24, at 582 (3d ed.1985).  Another commentator advocates expansion of the federal court's power to compel party joinder for the purpose of compelling multiple *plaintiffs* to \*459 join in a single proceeding their claims against common defendants:

> Nonetheless, multiplicity is a harm to society's legitimate interest in judicial efficiency.  Courts are a public resource, providing publicly financed resolution of private disputes....  The duplication of effort is a major cause of the protraction of time needed to resolve cases and cannot be justified by plaintiffs' selfish strategic desire to sue separately.

[Freer, *supra*, 50 *U.Pitt.L.Rev.* at 832.]

Animated by analogous concerns about the undesirability of duplicative litigation, this Court in *Cogdell, supra,* decided to address the problem directly by applying prospectively the entire controversy doctrine to mandatory joinder of parties:

> In addition, the court is now confronted with a duplication of lawsuits, multiple actions each involving the identical controversy and the same witnesses.  The second lawsuit, though technically separate and independent, is in truth not much more than a re-run of the earlier lawsuit.  The waste and inefficiency are obvious.
>
> In sum, the failure to have joined these defendants in the earlier lawsuit is more than an unfortunate inconvenience.  It is inconsistent with all of the policies that surround the entire controversy doctrine.
>
> We thus conclude that the entire controversy doctrine appropriately encompasses the mandatory joinder of parties.  Accordingly, we now hold that to the extent possible courts must determine an entire controversy in a single judicial proceeding and that such a determination necessarily embraces not only joinder of related claims between the parties but also joinder of all persons who have a material interest in the controversy.

[116 *N.J.* at 26, 560 *A.*2d 1169.]

### C

Although this Court does not stand alone in expressing grave concern about the cost and inefficiency of duplicative litigation, it is entirely isolated, both from other courts and from authoritative commentators, in its choice of a remedy to compel party joinder.  No other jurisdiction authorizes dismissal of a subsequent action against a party simply because that party could have been joined in a prior action.  Allan R. Stein, *Commentary: Power, Duty and the Entire Controversy Doctrine,* 28 *Rutgers L.J.* 27, 30-32 (1996).

We need look no further than the practice in the federal courts to find a simpler and far less disruptive party-joinder mechanism.  Comparison with the federal practice is appropriate because, prior \*460 to the amendment of *Rule* 4:30A to comply with *Cogdell,* our rule of party joinder, which was contained exclusively in *Rule* 4:28, was modeled after the 1966 amendment to *Rule* 19 of the Federal Rules of Civil Procedure.  As we acknowledged in *Cogdell, Rule* 4:28 would not have mandated joinder of the hospital and staff members in the original action against the obstetrician and pediatrician. \*\*652 Cogdell, supra, *116* N.J. *at 13-14, 560* A.2d 1169.

The federal courts do not enforce party joinder by precluding a second cause of action against a party omitted from the first suit.  Their concern addresses only the parties in the *original* action, *Rule* 19 authorizing the court either to order joinder of additional parties or to dismiss the action in the absence of a party deemed indispensable.  See Stein, *supra,* 28 *Rutgers L.J.* at 31-32.

*Rule* 19, originally adopted in 1937, was completely rewritten in 1966 pursuant to the procedures mandated by the Rules Enabling Act, 28 *U.S.C.A.* §2072, requiring approval of the United States Supreme Court and the Congress.  7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1601, at 14 (2d ed.1986).  Although the revised Rule did not alter the fundamental principles governing party joinder, it redirected the court's focus away from conclusory classifications about parties and toward a more pragmatic evaluation of the factors that should inform decisions to require or excuse party joinder.  3A James W. Moore et al., *Moore's Federal*

E 17

696 A.2d 633
150 N.J. 424, 696 A.2d 633
(Cite as: 150 N.J. 424, 696 A.2d 633)

*Practice* § 19.01 (2d ed.1989). The revised *Rule 19*, virtually identical to our own *Rule* 4:28, reads in part as follows:

**Rule 19. Joinder of Persons Needed for Just Adjudication**

(a) **Persons to be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may *461 be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

(b) **Determination by Court Whenever Joinder not Feasible.** If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

(c) **Pleading Reasons for Nonjoinder.** A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as prescribed in subdivision (a)(1)-(2) hereof who are not joined, and the reasons why they are not joined.

The Advisory Committee Note to the 1966 amendment of *Rule 19* explains the shift from a formalistic to a pragmatic approach to party joinder. The Committee noted that the prior rule ambiguously implied that actions could be dismissed not only because of the absence of indispensable parties, but also because of the absence of persons "who ought to be parties if complete relief is to be accorded to those already parties." *Fed.R.Civ.P.* Rule 19 advisory committee's note. The amended rule "stresses the desirability of joining those persons in whose absence the court would be obliged to grant partial or 'hollow' rather than complete relief to the parties before the court[,]" the objective being to further not only the parties' interests but also those of the public in avoiding duplicative litigation. *Ibid.* Amended *Rule* 19(a)**653 authorizes the court to order joinder of those persons whose joinder is desirable under the Rule, provided that they are amenable to service and their joinder would not deprive the court of subject-matter jurisdiction. When any such persons cannot be joined, the court is to determine, based on pragmatic factors such as those set forth in subparagraph (b) of the Rule, "whether in equity and good conscience the action should proceed among the parties already before it, or should be dismissed." *Ibid.*

*462 As noted, in the event an action in federal court proceeds without a party whose joinder was desirable, no bar exists to a subsequent action against that omitted party irrespective of whether the court was informed of the desirability of that party's joinder. In practice, the district judge or a magistrate judge, at the pretrial conference held pursuant to *Rule* 16, attempts to identify those parties whose joinder is contemplated by *Rule* 19 and enters a scheduling order establishing a timetable for joining additional parties. In stark contrast to the preclusive rule of party joinder imposed by our entire controversy doctrine, the focus of the federal courts is on identifying and joining those parties that *Rule* 19 describes as being needed for a just adjudication of the first suit. The federal practice does not contemplate a preclusive rule prohibiting subsequent suits against parties omitted from the first action, the clear implication of that practice being that concerns about duplicative litigation are insufficient to justify additional efforts to bar successive suits.

To be sure, *Rule* 19, as does our *Rule* 4:28, authorizes dismissal of the first litigation if an indispensable

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

E 18

party cannot be joined and no practical means exists of avoiding the prejudice caused by the party's absence. However, in applying the dismissal provision the apparent focus of the federal courts is on "pragmatism" and "practicality." *Schutten v. Shell Oil Co.,* 421 *F.*2d 869, 874 (5th Cir.1970) ("The court must, however, always consider the possibility of shaping a decree in order to adjudicate between the parties who have been joined."); *see also Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 *U.S.* 102, 116, 88 *S.Ct.* 733, 741, 19 *L.Ed.*2d 936, 948-49 (1968) (reversing Court of Appeals's dismissal of litigation for non-joinder of indispensable party, and observing that where threat of relitigation was problematical court should not set aside valid judgment merely because it did not resolve entire controversy).

Professor John W. Reed, whose criticism of the rigid judicial approach to the concept of indispensable parties significantly influenced the revision of *Rule 19,* see Wright et al., *supra,*\*463 § 1601, at 9, argued eloquently and persuasively against the practice of dismissing the original action merely because the omission of a significant party made subsequent litigation inevitable:

> There is plain economic waste in duplicate litigation. If it can be made to appear to a court that a controversy presented to it will not be completely settled in A's absence, the court is clearly justified in inquiring whether it ought to require A's presence, or, lacking it, to dismiss the case. It will be observed immediately, however, that by nature minimizing litigation and conserving courts' energies are relative values to be weighed with other values in the scale of justice.... The equitable policy of doing justice "entire and not by halves" can be made to yield to countervailing factors which are more pressing. The mere fact that a second action may be required to determine the totality of issues involved in a controversy is not a bar to the maintenance of the incomplete first action.
>
> ....
>
> Courts exist for the determination of disputes among the people; in a particular litigation there is an obligation on the court to make a meaningful determination if at all possible.... The fact that unavoidably there may be required two or more actions to dispose of a dispute should not preclude the court from considering the case, despite the inclination to avoid repetitive litigation. If only through multiple suits can justice be done, there is

nothing inherent in our judicial system forbidding those several suits. Minimization of litigation is not an end in itself, and it has its price.

**\*\*654** [John W. Reed, *Compulsory Joinder of Parties in Civil Actions,* 55 *Mich.L.Rev.* 327, 335, 337 (1957) (footnotes omitted).]

Significantly, a number of leading state courts have adopted compulsory joinder rules modeled after *Rule 19. See, e.g., Ann. Cal. C.C.P.* § 389; *Del.R.Super.Ct. R.C.P.* Rule 19; *Mass.R.Civ.P.*Rule 19; *N.Y. C.P.L.R.* § 1001.

Some critics of *Rule 19* contend that that Rule compels joinder only in cases that pose a risk of potential double liability, inconsistent obligations of defendants, or impairment of a non-party's interest, and suggest that the mere prospect of multiple litigation might constitute an additional ground for compulsory party joinder. McCoid, *supra,*28 *Stan.L.Rev.* at 724-25. In comparing the merits of preclusive devices, such as an expanded concept of privity for purposes of *res judicata,* with inclusive devices, such as broader mandatory joinder, Professor McCoid prefers inclusive devices but counsels caution concerning all mechanisms for packaging litigation:

> **\*464** While it is tempting to seek to package litigation into a single suit by means of preclusive devices, provision of the opportunity to be heard guaranteed by due process argues that an inclusive device ordinarily is superior. Moreover, because a policy against multiplicity is not the only value at stake in cases of multiparty litigation centering on a single transaction, an inclusive device that permits weighing of competing values at the outset is highly desirable.
>
> ....
>
> Beyond that, I must acknowledge the real possibility that all of [the devices] may carry evils worse than the problem to which they are addressed. Use of any one of them may foment assertion of claims that otherwise would never be litigated and thereby increase the adjudication burden of courts. That risk is obvious where compulsory intervention and mandatory joinder are concerned.
>
> ....
>
> I do not know how to assess those risks, but their presence argues for caution in developing a response to the multiplicity problem.... It is as well, perhaps, that the responses thus far have been ad hoc and tentative. The remedy is sometimes worse

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

E 19

than the disease.

[*Id.* at 728.]

Professor McCoid endorses a modification of the federal rules that would subject the certification required by *Rule* 19(c)--mandating that pleadings state the names of parties described in *Rule* 19(a) that are not joined and the reasons for non-joinder--to the sanctions provision of *Rule* 11. *Id.* at 727-28. Professor Freer suggests that direct sanctions in the form of costs and counsel fees be imposed on a party who fails to notify the court of the identity of absent parties whose joinder is contemplated by *Rule* 19, and also proposes that *Rule* 19(a) be expanded to authorize compulsory joinder solely for the purpose of avoiding multiple litigation. Freer, *supra,* 50 *U.Pitt.L.Rev.* at 841, 844. Significantly, no proponent of expanded party joinder in federal practice advocates a preclusive rule that would bar a second action if the first action fails to include a party whose joinder would have been desirable.

II

In counseling against application of the entire controversy rule to party joinder, the Civil Practice Committee in 1984 prophetically warned of the onset of "second round" litigation designed to enforce mandatory party joinder:

> \*465 Another area of concern to the subcommittee is the intricate problems of preclusion which would arise in second round litigation as a consequence of the failure of parties to live up to a mandatory joinder of parties rule. Second round litigation would be haunted by the undefined dimensions of mandatory joinder in the first case. Thus Court calendars would become riddled with preclusion motions in a new ill-defined area of law.
>
> [Civil Practice Committee Memorandum, *supra,* at 5.]

The consequences anticipated by that warning have come to pass. Defendants in litigation of all types and degrees of complexity \*\*655 attempt to use the party-joinder aspect of the entire controversy doctrine to prevent meritorious adjudication of claims, and neither the lower courts nor this court have been able to promulgate clear and consistent standards that explain when the doctrine should and should not be applied. Although misapplications of the doctrine hardly are confined to attorney-malpractice litigation, that class of second-round preclusion litigation has

generated a number of unsound dispositions. For example, in *Karpovich v. Barbarula,* 150 *N.J.* 473, 696 *A.2d* 659 (1997), in which the Court today reversed the lower courts' preclusion of the second litigation, the record reveals that the "first" litigation consumed virtually no court resources. Karpovich and Burgio, the plaintiff and defendant in the first suit, settled their differences by Burgio agreeing to repay Karpovich all of her losses, including the losses for which Barbarula and Affinito, attorneys for Karpovich in part of the underlying transaction, were also responsible. The first "litigation" lasted only seven days, and consisted merely of the filing of Karpovich's complaint on February 25, 1994, and the entry of a default judgment against Burgio on March 3, 1994. *Id.* at 477-78, 696 *A.*2d at 661. The burden that the first litigation imposed on the Law Division was imperceptible. When Burgio defaulted, Karpovich instituted the second suit to recover that portion of her loss for which Barbarula and Affinito were responsible. *Ibid.* The lower courts applied the entire controversy doctrine to bar the second litigation, apparently either not recognizing or disregarding that the doctrine's purpose--to avoid duplicative litigation--was not at all implicated because of the negligible \*466 burden that the first suit imposed on the court system. *Id.* at 478-80, 696 *A.*2d at 661-62.

Similarly incongruous results have occurred in litigation not involving attorney-malpractice claims. This term the Court unanimously reversed the lower courts' inequitable application of the doctrine that barred a suit against individual partners to enforce payment of a settlement agreement entered into by a partnership to resolve a prior prerogative writ action against the partnership in which the partners were not parties. *Joel v. Morrocco,* 147 *N.J.* 546, 688 *A.*2d 1036 (1997). The Court noted that the first action involved a challenge to the validity of a planning board's grant of site plan approval to the partnership, an action in which the partners individually would have been irrelevant. *Id.* at 554, 688 *A.*2d 1036. The partnership agreed to settle the case, then challenged the settlement, and the Law Division ordered the partnership to execute the settlement agreement. After the case was marked "settled" on the court's docket, the partnership refused to make payment. Supplementary proceedings revealed that the partnership was without funds. Plaintiff's assignee then sued the individual partners, resulting in dismissal on the ground that those partners should have been joined in the first

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

E 20

proceeding. *Id.* at 551-53, 688 *A.*2d 1036. Reversing, we explained the unfairness of penalizing plaintiff for not joining in the first proceeding parties whose participation was completely irrelevant to the relief sought. *Id.* at 554-56, 688 *A.*2d 1036. Only a significant misperception by the lower courts of the purpose and scope of the doctrine's application to party joinder could explain so unjust a result.

*Joel v. Morrocco* is an egregious example of the preclusion of meritorious claims that lower courts perceive to be mandated by the entire controversy doctrine's application to party joinder. Today the Court proposes a lighter touch, suggesting that the doctrine need not invariably result in preclusion of the subsequent litigation. In fact, the Court indulges in a bit of judicial revisionism when it declares for the first time, undoubtedly to the surprise *467 of bench and bar alike, that preclusion has *always* been a remedy of last resort:

> We have always emphasized that preclusion is a remedy of last resort. The purpose of the doctrine is not to bar meritorious claims, but to encourage litigants to bring to the attention of trial courts persons who should be joined in a proceeding....
>
> The reality, however, is that some attorneys have elected to conceal, or withhold, claims against additional parties. That practice illustrates the need for a procedural device, such as *Rule* 4:30A, to protect **656 parties, the courts and the public from excessive and costly litigation. In that limited context, when no lesser remedy would suffice, a court may resort to preclusion.
>
> [*Ante* at 447-48, 696 *A.*2d at 645 (citations omitted).]

The Court proceeds to emphasize that all it really seeks to achieve is notice to the trial court of the potential claim against another party:

> Although unnecessary, a formal motion under *Rule* 4:28 to join a party would suffice. The plaintiff need only notify the first trial court of the party now alleging preclusion. Failure to comply with those requirements need not lead to preclusion of the second action. If a remedy other than preclusion will vindicate the cost or prejudice to other parties and the judicial system, the court should employ such a remedy.
>
> [*Ante* at 448, 696 *A.*2d at 645 (citation omitted).]

I applaud the Court's attempt to modify the adverse effects of its heretofore rigid application of the party-joinder aspect of the entire controversy doctrine. But the Court's own application of the doctrine has not been nearly as flexible as its rhetoric implies. The concessions now offered by the Court are constructive, but they will not eliminate the profusion of dismissal motions in second-tier litigation that seek to test the entire controversy doctrine's vulnerability and its outer limits. The evidence of the doctrine's application to date points overwhelmingly to the conclusion that preclusion of the second suit is an unjust, inefficient, and counter-productive mechanism for enforcing party joinder.

III

Constructive and less draconian mechanisms for encouraging party joinder are available to the Court. Although I believe the party-joinder provisions of *Rule* 4:28 to be entirely adequate, the *468 Court could consider amending that Rule to enhance the authority of the trial court to order joinder of omitted parties in order to avoid unnecessary duplicative litigation. The certification required to be filed with the first pleading by *Rule* 4:5-1(b) to disclose the identity of parties who should be joined in the action, and whether any other action or arbitration concerning the matter in controversy is pending or contemplated, could explicitly be made subject to the sanctions provisions of *Rule* 1:4-8(b), undoubtedly resulting in a higher level of compliance with *Rule* 4:5-1(b). In addition, the pretrial conference procedure authorized by *Rule* 4:25-1 could be expanded or modified to enable the judge to elicit at an early stage of litigation the identity of omitted parties whose joinder would be constructive and consistent with the Court's party-joinder rule. The experience of the federal courts and other state courts, combined with our own unsuccessful experiment with second-round preclusion litigation, strongly suggests that efforts to expand party joinder should be remitted to the case-management discretion of the trial judge in the first litigation. That approach provides the parties, who know their case best, and the trial court with an opportunity to determine whether efforts should be made to seek joinder of omitted parties. Once that determination is made, our judicial system would be far better served by absorbing the risk of subsequent litigation than by maintaining in place a preclusive rule of uncertain dimension that generates more litigation than it avoids.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

696 A.2d 633                                                                                                                      Page 22
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

Perhaps the most fundamental objection to the preclusive rule established by *Cogdell* is that it prevents the judicial system from performing its most basic function--resolving cases and controversies on their merits. The inevitable result of the *Cogdell* principle, and its preclusive application in cases like *Mortgageling Corp. v. Commonwealth Land Title Ins. Co.,* 142 *N.J.* 336, 662 *A.*2d 536 (1995), is that it prohibits an adjudication of the merits of the second claim, remitting the parties in many cases to malpractice claims against their lawyers. Putting to one side the soundness of the extra-territorial aspect of *Mortgagelinq*'s application of the entire controversy doctrine in a case in which the first suit was *\*469 filed in federal court, *see, e.g.,* Rochelle Cooper Dreyfuss & Linda J. Silberman, *Interjurisdictional Implications of the Entire Controversy Doctrine,* 28 Rutgers L.J. 123 (1996), the Court's decision barred Mortgagelinq, a mortgage lender, from obtaining *\*\*657 a meritorious adjudication in a New Jersey court of its claim that it had been defrauded by three title insurance companies, a title agency, and three employees of those entities. Although our dismissal was without prejudice to plaintiff's right to proceed in federal court, 142 *N.J.* at 348, 662 *A.*2d 536, our disposition effectively closed our courthouse doors to the plaintiff merely because the defendants had been omitted from the earlier federal litigation in which their joinder was not required by the Federal Rules. That result conflicts fundamentally with our Court's longstanding preference for meritorious dispositions unobstructed by procedural snares. In our historic decision in *Winberry v. Salisbury,* which established this Court's primacy over rules of practice and procedure, we explained our decision in part by emphasizing that procedure should be made "subsidiary ... to the substantial rights of the litigants. The courts may avoid the snarls of procedural red tape and concentrate on the substantive questions at issue." 5 *N.J.* 240, 254, 74 *A.*2d 406 (1950).

In a recent claim-joinder entire controversy appeal in which the Court affirmed the dismissal of the second action even though the precluded litigant had been represented by assigned insurance counsel in the first suit, I expressed the view that the preclusive effect of the Court's disposition conflicted with the most basic objectives of those responsible for the strengthened judiciary established by the 1947 Constitution:

The framers of the Judicial Article of the 1947

Constitution would be appalled to learn that the "fusion of the powers of Law and Chancery in one Superior Court," designed to avoid the delay and duplication that results from "the splitting of a controversy," has been transformed into a bureaucratic procedural snare that closes the courthouse doors to innocent litigants with meritorious claims. The Court ignores at its peril the profound words of Justice Jacobs, one of the primary authors of the Judicial Article: "[A]fter all, justice is the polestar and our procedures must ever be moulded and applied with that in mind."
[*Prevratil v. Mohr,* 145 *N.J.* 180, 211, 678 *A.*2d 243 (1996) (Stein, J., dissenting) (citations omitted).]

*\*470 The Court overestimates the value of preclusion as the ultimate means of enforcing party joinder, and underestimates the harm that the party joinder prong of the entire controversy doctrine has inflicted on our judicial system. The Court describes the value of the rule as protecting "parties, the courts and the public from excessive and costly litigation" in those rare cases in which attorneys "have elected to conceal ... or withhold ... claims against additional parties." *Ante* at 447-48, 696 *A.*2d at 645. As noted, *supra* at 467-68, 696 *A.*2d at 656-57, the imposition of sanctions, combined with more aggressive participation by trial courts at the pre-trial conference, could assist in more effective identification of omitted parties and in discouraging attorneys from withholding from the court information about potential additional parties. Preclusion, on the other hand, punishes *litigants* who are often innocent victims of an attorney's omission to join a party, and whose meritorious claim is barred except only for the redress that a malpractice claim against the lawyer may afford. Preclusion also breeds disrespect for the judicial process, because it substitutes for the meritorious adjudication of litigants' claims, to which our civil justice system heretofore has been devoted, a non-meritorious procedural bar to justice triggered merely by a lawyer's decision, whether purposeful or merely ill-advised, to omit a party from a prior lawsuit.

A case in point is *Rapuano v. Altongy,* No. A-003854-95T2 (App.Div. Apr. 18, 1997), in which the Court denied certification on July 16, 1997, 151 *N.J.* 77, 679 *A.*2d 549 (1997), the petition having challenged the Appellate Division's dismissal of the case under the entire controversy doctrine. Although

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

E 22

696 A.2d 633
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

no substantive significance ordinarily should be inferred from a denial of certification, *Rapuano* illustrates a very recent preclusive application by the lower courts of the party-joinder prong of the doctrine. Plaintiff, a self-employed contractor and businessman who had lost his left hand in a childhood accident, sustained severe personal injuries as an automobile passenger **658 in an accident with a tractor trailer in November 1990. His injuries included a <u>fractured humerus</u> in his right arm, two <u>herniated discs</u> of the lumbar spine, *471 four <u>herniated discs</u> of the cervical spine, <u>tears of the meniscus</u> in the right knee, extensive dental injuries requiring a bridge to replace eleven teeth, concussion and head injuries, and traumatic <u>injury to the liver</u> and rib cage. He sued the trucking company and both drivers, settling that litigation in January 1993 for $790,000. Dr. Altongy, a defendant in the second litigation, had performed open reduction surgery in 1990 to repair plaintiff's fractured right humerus bone, but the surgery was unsuccessful. A second operation by a different surgeon in January 1992 was successful in uniting the broken bone fragments. However, plaintiff asserted that Dr. Altongy's negligence in selecting an inappropriate surgical procedure resulted in permanent nerve damage in his right arm, numbness in three fingers, and significant loss of motion. Plaintiff sued Dr. Altongy and his orthopedic group in June 1993, claiming damages distinct from those recovered in settlement of the first litigation. Although Judge Lawrence Weiss initially denied defendant's motion to dismiss based on the entire controversy doctrine, the motion was renewed and granted by Judge Alexander Menza. In an unreported opinion the Appellate Division affirmed, noting that plaintiff had received an expert's report describing Dr. Altongy's negligence about sixty days prior to settlement of the first litigation, and therefore could have joined the medical defendants in the first suit. Slip op. at 7.

If preclusion is to be a remedy of last resort, the Court's decision to deny certification in *Rapuano* is noteworthy. The petition persuasively relied on *Illiano v. Seaview Orthopedics,* in which another Appellate Division panel rejected application of the entire controversy doctrine to an analogous medical malpractice claim that followed an automobile negligence suit, observing that the claim against the physician "arising out of his conduct during the litigation had no causal nexus with plaintiff's claim against the other driver.... It is rather a separate and tangential controversy arising out of an altogether

different relationship having its own set of responsibilities and obligations." 299 *N.J.Super.* 99, 106-07, 690 *A.2d* 662 (1997). Obviously, the liability claims in the two suits filed by plaintiff in *Rapuano* are based on entirely *472 different facts and relationships, and our caselaw clearly reveals the procedure to be followed by a trial court in apportioning damages caused by both a settling and non-settling defendant. See *Kiss v. Jacob,* 138 *N.J.* 278, 283-84, 650 *A.2d* 336 (1994). Analytically, whether *Cogdell* contemplates mandatory joinder of the medical defendants in the original tort litigation presents at the very least an unsettled question, although in my view joinder clearly is not required. Moreover, equitable considerations suggest that the sixty-day window between receipt of the expert's report and the settlement of the automobile accident litigation is too short a time to justify the extreme remedy of dismissal of the malpractice claim for failure to join it in the original action. The added burden that the medical malpractice claim in *Rapuano* would have imposed on our judicial system is negligible, the liability issues being entirely distinct from those in the original tort litigation, and the injustice of dismissal and preclusion of that claim ought to be intolerable. Contrary to the Court's rhetoric, in practice preclusion proves to be the remedy of *first*--not last--resort, and innocent litigants will continue to be denied their day in court as long as trial courts have the discretion to dismiss suits because of non-joinder of parties in prior litigation.

On other occasions this Court has been willing to overrule a prior decision when a majority of the Court has become convinced that the earlier decision was mistaken. See, e.g., *Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc.,* 135 *N.J.* 349, 358, 640 *A.2d* 788 (1994) (overruling *Perini v. Greate Bay Hotel & Casino, Inc.,* 129 *N.J.* 479, 610 *A.2d* 364 (1992)); *State v. Ragland,* 105 *N.J.* 189, 196-98, 519 *A.2d* 1361 (1986) (overruling in part *State v. Ragland,* 101 *N.J.* 33, 499 *A.2d* 1366 (1985)). We should follow that course here.

The majority opinion acknowledges that the widespread criticism of our *Cogdell* decision may require the Court's future reconsideration. *Ante* at 445-48, 449, 696 *A.2d* at **659 644-45, 646. In my view, there can be little doubt that *Cogdell* should be overruled. As former New York Mayor Fiorella LaGuardia once said, *473 "When I make a mistake, it

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.



696 A.2d 633
150 N.J. 424, 696 A.2d 633
**(Cite as: 150 N.J. 424, 696 A.2d 633)**

is sure to be a beaut." By any measure, the decision in *Cogdell,* for which I assume my full share of responsibility, meets the late Mayor's standard. Our job now is to correct it so that the judiciary, the bar, and our state's litigants can return to the business of resolving cases on their merits.

IV

I join in the Court's disposition of this appeal, but not because I agree with its determination that the entire controversy doctrine should not apply to attorney-malpractice. Rather, I would overrule *Cogdell, supra,* 116 *N.J.* 7, 560 *A.*2d 1169, and consequently would no longer apply the entire controversy doctrine to bar second suits against parties omitted from prior litigation. For the same reason, I join in the majority's disposition in *Karpovich v. Barbarula, supra,* 150 *N.J.* 473, 696 *A.*2d 659, and *Donohue v. Kuhn,* 150 *N.J.* 484, 696 *A.*2d 664, also decided today.

*For affirmance*--Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN--6.

*Concurring in part and dissenting in part*--Justice STEIN--1.

150 N.J. 424, 696 A.2d 633

END OF DOCUMENT

E 24

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.